IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


UNITED STATES OF AMERICA,          )
                                   )  3:07CR154
          Plaintiff,               )  AUGUST 17, 2009
                                   )
     vs                            )
                                   )
KATHLEEN GIACOBBE (2)              )
PORFIRIO ORTA-ROSARIO (3),         )
CHRISTOPHER OTIKO (5),             )
                                   )
          Defendant.               )
_____/


VOLUME VI
MORNING SESSION

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE UNITED STATES:      DANA WASHINGTON, ESQ.
                            MELISSA RIKARD, ESQ.
                            U. S. Attorney's Office
                            227 W. Trade Street
                            Suite 1700
                            Charlotte, NC 28202



FOR DEFENDANT GIACOBBE:     SCOTT H. GSELL, ESQ.
                            212 S. Tryon Street
                            Charlotte, NC 28281

APPEARANCES CONTINUED:

FOR DEFENDANT ORTA-ROSARIO:    KEVIN TATE, ESQ.
                               PETER ADOLF, ESQ.
                               Federal Defenders of WNC
                               129 W. Trade Street
                               Charlotte, NC 28202

FOR DEFENDANT OTIKO:           MARK P. FOSTER, JR., ESQ.
                               1011 E. Morehead Street
                               Charlotte, NC 28202

Proceedings reported and transcript prepared by:

JOY KELLY, RPR, CRR
U. S. Official Court Reporter
Charlotte, North Carolina
704-350-7495

**I N D E X**

RULE 29 MOTIONS ...............1161


**WITNESS**                                              **PAGE**

CARMEN CATIZONE

   Direct Examination By Mr. Washington ............1112
   Voir Dire Examination By Mr. Adolf ..............1115
   Cross Examination By Mr. Gsell .................1132
   Cross Examination By Mr. Adolf .................1133
   Cross Examination By Mr. Foster ................1152


RAJENDER WEST

   Direct Examination By Ms. Rikard ...............1153
   Cross Examination By Mr. Tate ..................1158
   Cross Examination By Mr. Foster ................1159


APRILE WHITESELL

   Direct Examination By Mr. Gsell ................1180
   Cross Examination By Mr. Washington ............1187
   Redirect Examination By Mr. Gsell ..............1188


CHRISTOPHER PAQUETTE

   Direct Examination By Mr. Gsell ................1188
   Cross Examination By Ms. Rikard ................1195
   Redirect Examination By Mr. Gsell ..............1196

I N D E X (CONTINUED)

**GOVERNMENT'S EXHIBITS**

**NUMBER**                                                    **ADMITTED**

31, 32, 33 ........................................1154


CERTIFICATE OF REPORTER ...........................1202

**P R O C E E D I N G S**

1

2             (Court called to order at 10:00 a.m. and

3    defendants present in courtroom.)

4             THE COURT:  Good morning everyone.  I hope

5    everyone had a relaxing weekend.

6             Are we ready for the jury?

7             MR. WASHINGTON:  The government is ready.

8             THE COURT:  Very well.  Call the jury.

9             (Jury enters courtroom at 10:01a.m.)

10            THE COURT:  Morning, jury.

11            Is the government ready to call its first witness?

12            MR. WASHINGTON:  Yes, thank you, Your Honor.  At

13   this time the government calls Dr. Carmen Catizone.

14            THE COURT:  I remind the parties about

15   sequestration.

16            MR. ADOLF:  Judge, my expert is present in the

17   courtroom pursuant to the rules to watch the other expert

18   witness testify.

19                  **CARMEN CATIZONE**

20   being duly sworn, was examined and testified as follows:

21                  **DIRECT EXAMINATION**

22   **BY MR. WASHINGTON**

23   Q    Good morning, sir.

24   A    Good morning.

25   Q    Could you please state your full name, spelling your

1    last name for the record.

2    A    Carmen Catizone.  C-A-T-I-Z-O-N-E.

3    Q    Where do you live, sir?

4    A    Illinois.

5    Q    Sir, what is your profession?

6    A    I'll a pharmacist, and the chief executive officer of

7    the National Association of Boards of Pharmacy.

8    Q    How long have you been employed by the National

9    Association of Boards of Pharmacy?

10    A    For 25 years.

11    Q    Can you explain to the jury briefly what that

12    organization does?

13    A    The National Association of Boards of Pharmacy is an

14    association whose members are the State Boards of Pharmacy,

15    that regulate pharmacies and pharmacists.  Pharmacists

16    cannot join the association.  Pharmaceutical companies are

17    not part of the association.  We exist to help the states

18    protect the public health.

19    Q    What are your duties with there?

20    A    As the chief executive officer I oversee all the

21    operations, all the programs and services, and all of the

22    strategic planning and implementation of the association.

23    Q    Have you held other positions at the National

24    Association of Board of Pharmacies?

25    A    Before being named executive director, I was the test

CATIZONE - DIRECT

1  and measurements director so I oversaw all the examine

2  programs that the association offers to the states.

3  Q    Could you describe your formal education to the jury?

4  A    I earned my bachelor of science in pharmacy from the

5  University of Illinois, and I also earned a master's degree

6  in pharmacy administration and health care policy from the

7  University of Illinois.

8  Q    Do you hold any professional licenses?

9  A    I'm currently licensed in the state of Illinois.

10 Q    And have you worked previously as a practicing

11 pharmacist?

12 A    I have worked both in the community setting and a chain

13 pharmacy, as well as in a hospital pharmacy.

14 Q    Do you have any particular expertise in the area of

15 online pharmacies?

16 A    I have been involved with the regulation and practice

17 of Internet pharmacies since 1995, when we first began to

18 research this practice area.

19 Q    Have you testified previously as an expert?

20 A    Yes, sir.

21 Q    Have you testified before State Boards of Pharmacy?

22 A    I've appeared before all the State Boards of Pharmacy

23 with the exception of Alaska.

24 Q    Have you testified in state court?

25 A    I have provided information and appeared in state court

CATIZONE - DIRECT

1  as well.

2  Q    Have you testified in federal court as an expert?

3  A    Yes, sir.

4  Q    Have you ever had the opportunity to testify before

5  Congress or the Senate?

6  A    Yes, sir.

7  Q    How frequently have you done that?

8  A    When the Internet pharmacies were a topic of Congress

9  and the Senate, I probably testified three, four times per

10 year before the various senate committees and house

11 committees, and even a panel of governors that were holding

12 hearings on Internet pharmacy.  Presently I testify maybe

13 once or twice a year before those committees.

14 Q    Have you appeared on radio and TV to discuss online

15 pharmacies?

16 A    Yes, sir.

17           MR. WASHINGTON:  Your Honor, at this time we'd

18 offer the witness, Carmen Catizone, as an expert in the area

19 of pharmacy practice and pharmacy regulation.

20           THE COURT:  Any objection?

21           MR. ADOLF:  Your Honor, may I have voir dire very

22 briefly?

23           THE COURT:  Very briefly.

24                    **VOIR DIRE EXAMINATION**

25 **BY MR. ADOLF**

CATIZONE - DIRECT

1 Q    Is it Dr. Catizone?

2 A    The "doctor" designation is from the State of Oklahoma

3 that awarded me that designation.  It's either doctor or

4 mister.

5 Q    Okay.  You said you have a bachelor's in science

6 pharmacy and a master's degree in a pharmacy-related field?

7 A    Pharmacy administration and health care policies, sir.

8 Q    But as far as the doctorate, that's an honorary

9 doctorate?

10 A    It's a designation the state awards the pharmacists

11 that are licensed to practice in Oklahoma.

12 Q    So any pharmacist licensed in Oklahoma would be a

13 doctor of pharmacy?

14          THE WITNESS:  Yes, sir.

15          MR. ADOLF:  Nothing further, Your Honor.  Thank

16 you.

17          THE COURT:  This witness will be allowed to render

18 an opinion in the area of pharmacy regulations.

19          MR. WASHINGTON:  Thank you, Your Honor.

20 **BY MR. WASHINGTON**

21 Q    Are there separate standards of practice for Internet

22 versus brick-and-mortar pharmacies?

23 A    The basic legal requirement for a pharmacy to practice

24 and a pharmacist to practice are the same between a

25 traditional brick-and-mortar pharmacy and an Internet

CATIZONE - DIRECT

1   pharmacy.

2        Internet pharmacies have some special distinctions:

3   How they accept prescriptions, how they process those

4   prescriptions, and how they delivery those prescriptions.

5   But those regulations conform, and are in compliance or

6   equivalent to the same regulations in a traditional

7   brick-and-mortar pharmacy.

8   Q    So what are some of the unique concerns that relate to

9   Internet-based pharmacy practices versus brick and mortar?

10  A    With a regular pharmacy, so to speak, a patient would

11  actually come in and deliver that prescription to the

12  pharmacist or technician.  With an Internet pharmacy, those

13  prescriptions are delivered online or through fax, so there

14  has to be extra security provisions to validate that

15  prescription, that relationship.

16       Also with the usual pharmacy, or brick and mortar, the

17  patient actually, or the caregiver, picks up that medication

18  at the pharmacy.  With the Internet pharmacy, that

19  medication may be mailed or delivered to the patient.

20  Q    Is the NABP involved in initiates to address these

21  unique concerns?

22  A    Yes, we are.

23       In 1997 we launched a program called Verified Internet

24  Pharmacy Practice Site Program whereby we designated sites

25  that we considered to be operating in compliance with state

1  and federal laws, and a set of criteria that we developed in

2  association with the Food and Drug Administration, the Drug

3  Enforcement Agency, consumer groups, and other stakeholders

4  and to distinguish those pharmacies from sites we considered

5  rogue sites, or sites that may be violating federal or state

6  laws or were not in compliance with our criteria.

7  Q    So what's a rogue site?

8  A    A rogue site is a site that upon us researching that

9  site we have made a determination they are not in compliance

10 with state or federal laws, or have not adhered to the

11 criteria that we have set forth for accreditation.

12 Q    So are there legitimate Internet-based pharmacies?

13 A    Yes, there are.

14 Q    And about -- and are they in the this VIPPS program?

15 A    Some are in the VIPPS program, some are not.

16      We have 15 pharmacies representing 12- to 18,000

17 pharmacies across the United States that are accredited.

18      Another program that we offer is the Internet Drug

19 Outlet Identification Service whereby we search the Internet

20 actively for Internet sites, and separate out between those

21 sites again that we feel may be operating out of compliance

22 with state and federal laws.

23      And we have found that 94 percent of those Internet

24 sites are rogue sites or may be operating illegally, and so

25 there's another 6 percent of legitimately operating Internet

CATIZONE - DIRECT

1  sites.

2  Q    Could you identify for the jury some of the legitimate

3  Internet sites that members of the public might be aware of?

4            MR. FOSTER:  Objection.  Irrelevant.

5            THE COURT:  Overruled.

6  A    Some of the sites that are accredited are CVS,

7  Walgreens, drugstore.com, Medco Prescription Services.

8  Q    And what are the qualifications or requirements for

9  them to be accredited through the VIPPS program?

10 A    The first and primary requirement is that they must be

11 in compliance with all state and federal laws.

12         We verify that they are in licensed in all the states

13 which they are dispensing medication; that they have all the

14 processes and procedures in place to be in compliance, and

15 then we verify that they are adhering to the criteria that

16 we have established for the program.

17         If a pharmacy meets that first hurdle, we physically

18 inspect every aspect of that pharmacy.  So if it has a

19 website, we will travel to the website and inspect their

20 operations.  If they have a distribution center, we will

21 inspect the distribution center.  If they have pharmacies

22 that are distributing as part of that network, we will

23 physically inspect that to make sure that what they are

24 doing is exactly what they have said.

25 Q    With the online-based sites, is it important that they

1  verify the identity of the customers?

2  A    It's a requirement under state law that that identity

3  be verified in one of our criteria.

4  Q    And do they ensure that a doctor/patient relationship

5  exists?

6  A    Once again, it's a requirement that that relationship

7  be valid, and that the pharmacist verify that relationship.

8  Q    Do they ensure that they are valid prescriptions?

9  A    Yes.

10  Q    Now, what steps are taken within these acceptable sites

11  in verifying the identity of providers?

12  A    Through our verification process we verify that the

13  pharmacy has a process in place whereby they'll verify the

14  patient identity from a government-issued identification or

15  through direct contact with the doctor writing the

16  medication, or through some other acceptable means where

17  they then document that the patient is who they say they

18  are.

19      The site must also verify that the doctor issuing those

20  prescriptions is licensed to practice in those states; that

21  the doctor has a valid relationship with that patient, and

22  that prescription is appropriate for that patient.

23      It must be used to treat the disease and condition they

24  have.  So if the medication is the wrong medication and

25  would harm the patient, the pharmacist has the

CATIZONE - DIRECT

1  responsibility to call that doctor and have that

2  prescription fixed.

3      And similarly, if the prescription is being used for

4  fraud or abuse or diversion, the pharmacist has the legal

5  responsibility to verify that; and if that's the case, to

6  not dispense the prescription.

7  Q    Do pharmacists have an obligation to verify a

8  doctor/patient relationship?

9  A    Yes, sir.

10 Q    What goes into that?

11 A    With the traditional brick and mortar, there's usually

12 a relationship between the pharmacy and the doctors and

13 patients so that relationship is validated.

14     With the Internet pharmacies that have been accredited

15 by our organization, there has to be processes in place

16 where the pharmacy contacts the doctor and validates that

17 relationship, and also validates that the doctor is licensed

18 to practice and is operating within their scope of practice.

19 Q    Is there a requirement for a face-to-face meeting?

20 A    Our definition and the definition of the State Medical

21 Practice Acts is that a valid doctor/patient relationship

22 has to involve a face-to-face examination.

23 Q    Now, what does a prescription require to be valid?

24 A    For a prescription to be valid, as I mentioned earlier,

25 it has to be appropriate for the disease and condition.  So

CATIZONE - DIRECT

1   if a person has diabetes, that prescription has to be for

2   diabetes; it can't be nor high blood pressure or something

3   else, otherwise it could harm the patient.

4       The prescription has to be based on that valid

5   doctor/patient relationship.  Again, the doctor and patient

6   have to be in conversation, there has to be a physical

7   examination and the patient should understand what that

8   treatment is for; and the prescription must not violate any

9   state or federal laws in order for it to be valid as well.

10  Q    Can it be faxed?

11  A    Controlled substances, except for the Schedule IIs,

12  which are very addictive medications, such as Demerol and

13  other products, can be faxed, as well as non-controlled

14  substances; prescriptions or diabetes, high blood pressure,

15  those types of medications.

16  Q    Does it have to be signed?

17  A    Noncontrolled substances don't have -- they have to be

18  signed, but those signatures can also be faxed.

19       Controlled substance prescriptions, the doctor has to

20  physically sign that prescription in the presence of the

21  patients when that prescription is being dispensed.

22  Q    So for Schedule III and IV controlled substances, can

23  the prescription be unsigned?

24  A    No.

25  Q    Can it be presigned?

CATIZONE - DIRECT

1    MR. ADOLF:  Objection to misstating the law and

2  testifying to the law.

3    THE COURT:  Overruled.

4    THE WITNESS:  Could you repeat that?

5  Q    For Schedule III and IV, can it be presigned or signed

6  ahead of time?

7  A    No.

8    MR. FOSTER:  I object.  I would like to approach

9  sidebar at this time.

10    THE COURT:  Very well.

11    (Sidebar conference reported as follows:)

12    MR. FOSTER:  Your Honor, the basis of my objection

13  is this is far afield from the basis of his expertise.  It

14  sounds like he's testifying as to what the law requires,

15  which means he's going to end up giving an opinion on

16  everything.  It has to be done a certain way.  In other

17  words, he's invading the province of the jury testifying as

18  to what the law is.

19    MR. ADOLF:  He was qualified specifically as an

20  expert on online pharmacies.  We haven't heard anything

21  related to other than the victims program.

22    THE COURT:  He's qualified as an expert in

23  pharmacy regulation.  What's the government's response?

24    MR. WASHINGTON:  Your Honor, he's a pharmacist and

25  part of what a pharmacist does is fill prescriptions.  And

1  in order to determine whether or not it's a valid

2  prescription, he has to know the basic -- whether it has to

3  be signed or whether it can be signed ahead of time.  That's

4  squarely within the scope of what a pharmacist does.  And he

5  was qualified as a pharmacist.

6            MR. FOSTER:  It sounds like he's testifying as to

7  what the law requires as opposed to what pharmacy practice

8  is supposed to be.  I mean --

9            MR. ADOLF:  I would point out my earlier objection

10  to his testifying at all.  He's testifying to the exact same

11  things that the doctor testified to but from an pharmacist's

12  perspective, which is the same, and there's no pharmacist on

13  trial, so I don't know why he's testifying to all of that.

14            MR. WASHINGTON:  The conspiracy involved first of

15  all a pharmacist.

16            Secondly, through cross-examination, counsel has

17  argued with other witnesses that this is, in fact, an a

18  online pharmacy refill service.  That was exactly the

19  questions brought out by counsel, so he should be able to

20  respond to that.

21            THE COURT:  I'm going to overrule the objection.

22  I think he's qualified in the area of pharmacy regulation,

23  and he's entitled to testify as to the -- his opinion as to

24  the validness of the procedure at issue in this case.  So

25  I'm going to overrule the objections.

CATIZONE - DIRECT

1           MR. WASHINGTON:  Thank you, Judge.

2           (Sidebar conference concluded.)

3   **BY MR. WASHINGTON**

4   Q    Sir, the question was:  Based upon your training and

5   experience can a prescription be for a Schedule III drug to

6   be presigned?

7   A    No.

8   Q    When does it need to be signed?

9   A    It has to be signed when the doctor issues that

10  prescription in the presence or with the patient.

11  Q    Are prescriptions valid simply based upon the fact they

12  are issued by someone with a DEA license?

13  A    No, sir.

14  Q    Now, can you explain how the online-based pharmacies go

15  about filling scripts, the legitimate ones that you have

16  testified about?

17  A    For the sites that we've actually reviewed and

18  accredited, they will receive either a prescription directly

19  from the doctor or the doctor's office; they will take that

20  prescription then and validate that prescription with the

21  doctor in the doctor's office insuring that there was a

22  valid patient/prescriber relationship.

23          We do not allow any prescriptions to come directly from

24  the patient or any medical records that come from the

25  patient; everything is done directly with the doctor.  The

CATIZONE - DIRECT

1    online site must also verify that doctor again is licensed

2    to prescribe and dispense within their state, and that the

3    doctor is acting within their scope of practice.

4    Q    Do any of these sites generate a new script or new

5    prescription?

6    A    Of all the sites that I visited, and also the other

7    pharmacies that I'm aware of, the traditional brick and

8    mortar, no pharmacy generates a prescription.  The

9    prescription always comes from the doctor, having that valid

10   relationship with the patient.  Any of the sites that

11   generate their own prescriptions would not meet our

12   criteria.

13   Q    I'd like to show you what's been marked and previously

14   admitted as Government's Exhibit 4A.  It should appear on

15   the screen in the front of you.  And you have seen this memo

16   prior to testifying in court today?

17   A    There's nothing on my screen.  Oh, yes.

18        Yes, I have seen this.

19   Q    Based upon your training and experience as a

20   pharmacist, is it a typical or acceptable practice to have a

21   memo such as this being held by the pharmacy?

22   A    No.

23   Q    Why not?

24   A    The first part of the memo, which indicates that those

25   prescriptions will be presigned, if it is for a controlled

CATIZONE - DIRECT

1  substances, it's in violation of federal and state law and

2  that is not allowed.

3          MR. FOSTER:  Objection.  Lack of foundation.

4  Motion to strike.

5          THE COURT:  Overruled.

6  **BY MR. WASHINGTON**

7  Q    How about the second portion?

8  A    In some cases doctors will designate or delegate

9  authority for individuals within their practice to provide

10  information, but this waiver provides far-reaching

11  authority, and actually allows these individuals, in my

12  opinion, to engage in the practice of medicine, and it's not

13  something I've seen with our Internet pharmacies or

14  traditional brick and mortar pharmacies.

15          MR. ADOLF:  Objection to that answer, being beyond

16  the expertise, Your Honor, and move to strike.

17          THE COURT:  Overruled.

18  **BY MR. WASHINGTON**

19  Q    I'd like to next show you what's been marked as

20  Government's Exhibit 35B.

21          Based upon your training and experience as a

22  pharmacist, is this mix of narcotics distributed consistent

23  with typical pharmacy practice?

24  A    No.

25          MR. FOSTER:  Objection.  Irrelevant.

CATIZONE - DIRECT

1    THE COURT:  Overruled.

2  Q    Go ahead.

3  A    No, sir.  There are two sources of information that I

4  can base that upon:

5      One: based upon our review of Internet pharmacies and

6  brick-and-mortar pharmacies, the usual mix of prescriptions

7  that a pharmacy would dispense would include medications for

8  high blood pressure, antibiotics, diabetes; the unusual

9  typical diseases or symptoms that people would present to a

10  pharmacy.

11      In this case the overabundance of controlled substances

12  and the limited number of medications becomes a red flag for

13  us, and is far outside of the scope of any pharmacy that

14  we've reviewed, or any of the brick-and-mortar pharmacies

15  that we've seen.

16      The second source is information published by the

17  National Association of Chain of Drugstore and IMS

18  Information Services lists that the average pharmacist --

19  pharmacy across the country dispenses between 12 and

20  15 percent of their total prescriptions are controlled

21  substances.

22      If you look at this chart, it's quite the opposite.

23  Some 90-some percent or 80-some percent of their

24  distribution is controlled substances, which is the exact

25  opposite of what we've seen for traditional brick-and-mortar

CATIZONE - DIRECT

1  pharmacies and our Internet pharmacies, and the data that

2  exists for pharmacies across the country.

3          MR. WASHINGTON:  Could I see 35C?  Could you show

4  35C to the witness.

5  Q    Can you see 35C?

6  A    Yes, sir.

7  Q    And does the information contained within 35C, is that

8  consistent with what you see in a legitimate pharmacy

9  practice?

10 A    No, sir.

11 Q    Why not?

12 A    Again, the overabundance of controlled substances,

13 particularly this limited number of controlled substances,

14 the hydrocodone is annexed, the carisoprodol.  That

15 proportion, that quantity we would not see, I have not seen

16 in the traditional brick-and-mortar pharmacy or our Internet

17 pharmacy.

18 Q    And Government's Exhibit 35D.  This shows a number of

19 refills showing that 95 percent receive -- of hydrocodone,

20 shows three refills; 94 percent for benzodiazepine; and 95

21 percent for carisoprodol.  What is that, carisoprodol?

22 A    Some people may know it more as Soma.  Soma is the

23 brand name.  It's a muscle relaxant.

24        Based upon, again, the literature, that product is

25 something that is used to extend the effects of the

1  hydrocodone and others.  It's also used in combinations with

2  other products to create a heroin-like high for people that

3  abuse prescription drugs.

4  Q    Could I show the witness 12G.  Can we go to the next

5  page; next, next.  There we go.  Back please.  That page.

6       Have you reviewed this waiver?

7  A    Yes, sir.

8  Q    Based upon your training and experience, are these tips

9  of waivers consistent with legitimate pharmacy practice?

10 A    No, sir.

11 Q    Why not?

12 A    This is another one of the red flags that we identify

13 when we separate rogue pharmacies from legitimately

14 operating pharmacies.

15      I'm not aware of any pharmacy in the United States,

16 brick and mortar, where a patient walks into that pharmacy

17 and before that pharmacist will dispense the medication, the

18 pharmacy asked that patient to sign a waiver which says that

19 the pharmacy is not responsible for any of the legal aspects

20 or any of the liability for dispensing that prescription.

21      These are the types of things that we've seen with

22 rogue pharmacies that we have identified and not awarded

23 accreditation to.

24           MR. ADOLF:  Objection.  Move to strike.  This has

25 nothing to do with the pharmacy.

CATIZONE - DIRECT

1      THE COURT:  Overruled.

2  **BY MR. WASHINGTON**

3  Q    Was the Woody Pharmacy or youronlinedoctor.com

4  currently or ever registered as an accredited VIPP site?

5  A    No.

6      MR. FOSTER:  Objection.  Irrelevant.

7      THE COURT:  Overruled.

8  A    No, sir.

9  Q    Would this site, Your Online Doctor, qualify?

10 A    No, sir.

11     MR. FOSTER:  Objection.  Irrelevant.

12     THE COURT:  Overruled.

13 Q    Why not?

14 A    Based upon my review of the operations, the lack of a

15 valid doctor/patient relationship, the mix of prescription

16 products which specialize only in the hydrocodone and other

17 controlled substances, the fact that the doctors were

18 located in one state and prescribing medications for

19 patients across the United States without a valid

20 relationship, those are the primary reasons that it would

21 not meet our accreditation.

22 Q    And based upon your training and experience, do you

23 have an opinion as to whether this site operated within the

24 acceptable scope of pharmacy practice?

25 A    Based upon my opinion, no.

CATIZONE - DIRECT

1      MR. WASHINGTON:   Thank you, sir very much.

2      THE COURT:  Mr. Gsell, cross.

3      MR. GSELL:  Briefly, Your Honor.

4                     **CROSS EXAMINATION**

5  **BY MR. GSELL**

6  Q    Good morning, Dr. Catizone.  My name is Scott Gsell.  I

7  represent Kathy Giacobbe.  She owned Your Online Doctor.

8      Your understanding is that Your Online Doctor was an

9  Internet website.  Correct?

10 A    Yes, sir.

11 Q    Okay.  And to the best of your knowledge, they didn't

12 store any prescription medicine at that location?

13 A    No, sir.

14 Q    And to the best of your knowledge, it was not a retail

15 pharmacy.  Correct?  Well -- strike that.

16     Do you know where Your Online Doctor was located?

17 A    Yes, sir.

18 Q    Where was that?

19 A    Vermont.

20 Q    Okay did you have a chance to go out and view that

21 location personally?

22 A    No, sir.

23 Q    Based on your investigation, you don't have any

24 information that Your Online Doctor was a walk-in pharmacy,

25 brick-and-mortar pharmacy as you call it.  Correct?

1  A    Correct.

2  Q    To the best of your knowledge, they didn't store any

3  medication in that location in Vermont.  Correct?

4  A    Correct.

5  Q    All of the prescription medications, based upon your

6  review, were issued from the two Woody's Pharmacy's here in

7  North Carolina.  Correct?

8  A    Were dispensed, yes, sir.

9          MR. GSELL:  Okay.  I have no further questions,

10  Your Honor.  Thank you.

11          THE COURT:  Mr. Adolf, Tate.

12                **CROSS EXAMINATION**

13  **BY MR. ADOLF**

14  Q    Mr. Catizone, my name is Peter Adolf.  I'm here

15  representing Dr. Orta.  I'm going to ask you a few

16  questions.  If there's anything I ask you that's confusing,

17  doesn't make sense, let me know and I'll try to straighten

18  that out.  Okay?

19  A    Yes, sir.

20  Q    You talked about this VIPPS program that your

21  organization runs.

22  A    Yes, sir.

23  Q    Is that required that anybody sign up for that?

24  A    It's required by four states and recognized by 12 other

25  states.

CATIZONE - CROSS

1   Q    So for the vast majority of the country, it's fair to

2   say there's no requirement that anybody sign up with your

3   organization.  Right?

4   A    Yes, sir.  Correct.

5   Q    So all of the standards and so forth that you were

6   talking about that you require in totality are optional?

7   A    Except for the compliance with state and federal law,

8   yes, sir.

9   Q    Right.  And you said that, you told us that there are

10  hundreds, perhaps thousands of Internet pharmacies or

11  pharmacies that do business over the Internet and so forth

12  in the country and around the world.  Right?

13  A    Yes, sir.

14  Q    And your organization has been offering this

15  certification now for -- is it ten years, 15 years?

16  A    Since 1999.  Ten years.

17  Q    And in that time, 15 pharmacies and pharmacy chains

18  have signed up for that?

19  A    Yes, sir.

20  Q    Is it fair to say that a tiny drop in the bucket of the

21  world of pharmacies that could be eligible for that

22  certification?

23  A    It's a small percentage, sir, yes.

24  Q    One reason for that is because of the fees your

25  organization charges for that.  Right?

CATIZONE - CROSS

1   A    No, sir.

2   Q    Isn't it $1,000 a year or thereabouts to get that

3   certification?

4   A    Yes, sir.

5   Q    For a certification that for most is totally optional?

6   A    Yes, sir.

7   Q    Indeed, for most of them, the only draw for signing up

8   for your organization's certification is a marketing device.

9   Right?

10  A    No, sir.

11  Q    It's a Good Housekeeping Seal of Approval, if you will?

12  A    Yes, sir.

13  Q    And that's something they market to their customers.

14  Right?

15  A    It's a symbol that they say -- says they are operating

16  legally, as well as in the states where it's required, they

17  must achieve our accreditation.

18  Q    And the organizations that have signed up for it by and

19  large are large national chains who cover all of their

20  pharmacy operations was a single fee.  Right?

21  A    Yes, sir.

22  Q    Whereas a local pharmacy, mom-and-pop-type pharmacy,

23  would have to pay your organization the same amount as

24  Walgreens nationally has to pay them for that certification.

25  Right?

CATIZONE - CROSS

1   A    No, sir.  The fee is different for a multioperational

2   pharmacy.  It's $1,000 for a single pharmacy; and then

3   $5,000 for multioperation pharmacy.

4   Q    So a small mom and pop local pharmacy that wanted to

5   get your certification would be paying $1,000 year for that

6   privilege.  Right?

7   A    $1,000 the first year and then it's $300 after that.

8   Q    Whereas, Walgreens could split -- can divide that fee

9   or can pay for that fee out of the proceeds of all of its

10  pharmacies nationwide and worldwide.  Right?

11  A    That would be a Walgreens question how they finance it,

12  but ...

13  Q    But there are a lot -- you say it's $5,000 a year that

14  you charge the entire Walgreens organization for that.

15  Right?

16  A    Yes, sir.

17  Q    A drop in the bucket for them.  Right?

18  A    I couldn't know, sir.

19  Q    You used the term "rogue pharmacy" a bunch of times.

20  Is that term described in law anywhere?

21  A    No, sir.

22  Q    Is that term described in state regulation anywhere?

23  A    No, sir.

24  Q    That's just a term you use to divide in your mind

25  pharmacies that are legitimate and for those that are

CATIZONE - CROSS

1  illegitimate?

2  A     In our organization, yes, sir.

3  Q     And your organization is a private organization.

4  Right?

5  A     Yes.

6  Q     That charges a fee to its members for its services.

7  Right?

8  A     We charge each state $250 a year for all the services

9  we provide.

10 Q     Now, is it fair to say that hydrocodone is the most

11 commonly prescribed prescription medicine in America?

12 A     The latest survey I saw from Drug Topics, which is a

13 trade journal, indicated it was the most prescribed and the

14 most abused.

15 Q     I don't know if that answered my question exactly.  But

16 it is the most prescribed drug in America.  Right?

17 A     Yes, sir.

18 Q     So I guess if drugs were going to be abused, the most

19 commonly used also may very well be the most commonly abused

20 just because there are so many more people using them?

21 A     Not true, sir.  The last time the survey was done, the

22 antibiotic, amoxicillin, was the most commonly prescribed,

23 and again hydrocodone was the most commonly abused at that

24 time.

25 Q     But there have been a number of years -- hydrocodone is

CATIZONE - CROSS

1    routinely over say the last ten years, in many of those

2    years has been the most prescribed drug in America?

3    A    I've only seen it within the last year, sir.

4    Q    Now, you told us earlier that in your opinion a

5    prescription is invalid if it is not the product of a doctor

6    having seen a patient face to face.

7    A    Yes, sir.

8    Q    Is that written in law anywhere?

9    A    Yes, sir.

10   Q    Where is that?

11   A    It's in the Medical Practice Acts of all the states

12   that I reviewed, including South Carolina, North Carolina,

13   and a number of other states where it specifically says

14   there must be a face-to-face examination.  Online

15   consultations are not a valid relationship.

16   Q    You'll 50 states have that law?

17   A    I would say 48 of the 50.

18   Q    And when were those laws passed?

19   A    Some of them -- the North Carolina law was passed in

20   1999; the South Carolina law in 2000.

21   Q    And other 48?

22   A    The other states vary from 1999 forward, and I don't

23   know the exact date, sir.

24   Q    Right.  And in the years 2002 to 2006 there were

25   certainly plenty of states that had no written law -- what

CATIZONE - CROSS

1   we're discussing here is law, a statute -- there were

2   certainly plenty of states that had no statutes prohibiting

3   prescribing without face-to-face contact.  Correct?

4   A    The laws interpretation that the boards at the time had

5   rendered and the standards of care indicated that a

6   face-to-face examination was necessary for a valid

7   relationship.  What the states have done is to codify that

8   specifically to avoid people trying to exploit the loopholes

9   that they think exist.

10  Q    By "loophole" you mean something was not illegal and

11  they made it illegal?

12  A    No.  I think people tried to make something legal that

13  was illegal, and the courts are saying that that wasn't the

14  case.

15  Q    Okay.  I think we need to unpack that answer of yours a

16  little bit.

17       You were talking about something being illegal.

18  A    Yes, sir.

19  Q    Sir, when you say "illegal," apparently from what you

20  told me in your last answer you mean anything that violates

21  federal law?

22  A    Yes, sir.

23  Q    Or state law?

24  A    Yes, sir.

25  Q    Or anything that violates a medical ethics board's

CATIZONE - CROSS

1  guidelines?

2  A    No, sir.  Medical Standards of Practice.

3       All the Medical Practice Acts say that the activities

4  of the doctor must also meet the standards of care; and,

5  therefore, they are involved in unprofessional conduct or

6  they violated the standards of care.

7  Q    All right.  I guess what I need to do is try to go back

8  to my earlier question.

9       Was it written down anywhere in all of these states a

10 doctor may not prescribe a -- may not issue a prescription

11 without seeing the patient face to face in person?

12 A    I can't say that for every state, but I can say the

13 states that I reviewed in the majority of states had that

14 language in their Medical Practice Acts beginning from 1999

15 forward, but I can't testify to a specific state at this

16 point beyond the ones I mentioned.

17 Q    Now, and you mentioned federal law also?

18 A    Yes, sir.

19 Q    Now, you're aware there was nothing about that in

20 federal law before last year, was there?

21 A    Yes, sir, there was.

22      What federal law does, it sets the basis.  It says

23 there must be a valid prescription and there must be a valid

24 relationship.  And then federal law defers to the states to

25 regulate this.  And the State Practice Acts, as I mentioned

CATIZONE - CROSS

1   earlier, did contain language that reference what a valid

2   relationship would be.

3   Q    But the federal law didn't say that anywhere, did it?

4   A    It didn't specifically say what that relationship

5   needed to be.  It deferred to the states.

6   Q    Sir, you spent ten years testifying in front of

7   Congress repeatedly to try to get Congress to pass a law

8   saying that physicians should not be allowed to write

9   prescriptions unless they see someone in person face to

10  face.  Did you not?

11  A    No.

12  Q    Did you testify in 2004 in support of a law -- to try

13  to get a law like that passed?

14  A    No.  What I testified for was Internet regulation.

15       There was a specific bill that they asked us to comment

16  on.  And we provided comments about that bill, but we have

17  never testified in favor of a law or lobby.  We simply

18  provided information to Congress and the Senate when

19  requested.

20  Q    Well, you testified in 2003 before the Committee on

21  Government Reform.  Do you recall doing that?

22  A    Yes, sir.

23  Q    And the bill that was introduced as a result of that,

24  the Internet Pharmacy Consumer Protection Act, included a

25  provision saying that a physician could only prescribe after

CATIZONE - CROSS

1  seeing a patient face to face.  Right?

2  A    Yes, sir.

3  Q    And that was something you support?

4  A    Yes, sir.

5  Q    Just as you do today?

6  A    Yes, sir.

7  Q    And you believe that would be a positive step to do

8  that.  Right?

9  A    Yes, sir.

10  Q    And that's because federal law applies everywhere.

11  Right?

12  A    Yes.

13  Q    Whereas individual state laws apply one place but not

14  only places.  Right?

15  A    Yes, sir.

16  Q    Under federal law, if a law is passed, and it makes

17  something illegal in one state, it's going to be illegal

18  everywhere under federal law.  Right?

19  A    Yes, sir.

20  Q    On the other hand, if something is legal in one state

21  under federal law, that means it's legal everywhere under

22  federal law?

23  A    No, sir.  The way the law works is the more stringent

24  of the law takes precedent.  So if federal law allows

25  something, but a state makes it more stringent and doesn't

CATIZONE - CROSS

1    allow it, the more stringent law prevails.

2    Q    Maybe my question wasn't clear enough.

3         What you were testifying to is about federal law, state

4    law, medical practice boards, ethics guideline.  I want to

5    restrict you to federal law, was what you were discussing

6    earlier when you talked about a legitimate medical practice.

7    Correct?  Federal law?

8    A    It's as combination of federal and state.  You can't

9    look at one or the other, sir, without looking at both.

10   Q    Well, just look at federal law for a moment.

11        Is it your position that if anything is illegal under

12   state law, that makes it illegal in that state under federal

13   law, even if it's permitted somewhere else?

14   A    No, sir.  I think you're confusing the basics of the

15   law, and I apologize for -- it's not that it's illegal

16   federally; it's illegal based upon the state law.  And so

17   that activity is not allowed in that state.

18        It's the more stringent law whether it's federal or

19   state that takes precedent.  As an example, under federal

20   law some products are scheduled in Schedule III, and

21   throughout the country any state then would dispense that

22   without the requirements of it being more stringent.  In

23   other states that same product may be scheduled much higher

24   than Schedule II and therefore there are special state

25   requirements that supersede that federal law and make it

CATIZONE - CROSS

1   more stringent.

2   Q    I understand that in every state there's a whole bunch

3   of different guidelines and laws that doctors have to

4   follow.  Right?

5   A    Yes, sir.

6   Q    But federal law is the same in every state, is it not?

7   A    Yes, sir.

8   Q    So if something is permitted under federal law in one

9   state, then it is permitted under federal law in all states?

10          MR. WASHINGTON:  Objection to these legal

11  conclusions that he's being asked.

12          THE COURT:  Overruled.

13  A    Again, sir, that's not correct.  Just because federal

14  law allows it doesn't mean it would be legal if a state

15  passed a more stringent law saying that it was not legal.

16  Q    Now, you said that you had been testifying in front of

17  Congress you testified how many times in the last ten years?

18  A    Maybe 20, 30 times, sir.  I can't recall exactly.

19  Q    And at long last, last year, with your support, a

20  federal law was passed that said, in plain English, that a

21  doctor cannot prescribe medication for somebody if it's

22  related to an Internet practice unless they see the person

23  face to face.  Are you familiar with the law I'm talking

24  about?

25  A    If you're referring to the Ryan Haight Act, yes, sir.

CATIZONE - CROSS

1   Q    Right.  And what that did was before that passed, the

2   federal law said that a prescription has to be written

3   pursuant to -- for a legitimate medical purpose, which is

4   what you were testifying about earlier, in the course of the

5   physician's usual medical practice.  Right?

6   A    Yes, sir.

7   Q    After that law passed last year, now it says that's a

8   requirement, and there also has to be an in-person physical

9   examination by the physician.  Isn't that what the law

10  changed said?

11  A    What the law did is it took what was existing in state

12  law, that requirement of a face-to-face physical

13  examination, and now placed it in federal law.  So now it's

14  a requirement for just controlled substances, federally and

15  state.  It didn't remove the stated requirement, it didn't

16  create a requirement, it simply moved a state requirement to

17  the federal requirement.

18  Q    And from your perspective, you saw that as advantageous

19  because now that means the law is the same everywhere.

20  Right?

21  A    It helped, yes, sir.

22  Q    Because before individual states would do individual

23  things as far as their laws, their regulations, their ethics

24  guidelines, but the federal bottom line did not include any

25  statutory language about requiring a face-to-face physical

CATIZONE - CROSS

1  examination before issuing a prescription.  Correct?

2  A    It went right back to your earlier question.  Federal

3  law said here was a legitimate -- and the state passed more

4  stringent requirements that said a face-to-face was

5  required, and it varied from state to state.  So this

6  codified it across the board.  So your question earlier:

7  Can it be legal federally and illegal in the states?  That's

8  exactly what happened.  They made it now illegal across the

9  board.

10 Q    Whereas before it was determined on a state-by-state

11 basis?

12 A    Yes.  And the majority of the practice acts had that

13 requirement in place.

14 Q    Now, you told us earlier about Schedule II versus

15 Schedule III controlled substances.  Is it true that you

16 wanted to have -- you, personally, wanted to have

17 hydrocodone reclassified from Schedule III to Schedule II?

18 A    Yes, sir.

19 Q    And that was something that you addressed by writing

20 letters in your official capacity to the FDA and the DEA?

21 A    Yes, sir.  The members of our association, the states,

22 passed a resolution directing us to take that position

23 because of the abuse they were seeing in their states with

24 that product.

25 Q    And the reason you wanted it done in Schedule II

CATIZONE - CROSS

1    instead of Schedule III because that would change the

2    requirements for a prescription.  Right?

3    A    Yes, sir.

4    Q    And that's because federal law requires a written

5    prescription for Schedule II controlled substances but not

6    for Schedule III controlled substances.  Correct?

7    A    It's a special prescription that must be written for

8    Schedule II.  It's very different limitations than a

9    Schedule III.

10   Q    Well, federal law says a Schedule III, you can

11   prescribe with an oral prescription.  Right?

12   A    Yes, sir.

13   Q    So when you were talking earlier about -- the

14   prosecutor asked you about all the different requirements

15   for a prescription, and one was it has to be signed on the

16   same day that it's issued.  Right?

17   A    Yes, sir.

18   Q    But a prescription could just be oral?

19   A    If you're dealing with a written prescription, that's

20   the case.  If it's an oral prescription, the doctor can call

21   it in.  Two different requirements.

22   Q    So you're saying that a written prescription for

23   Schedule III requires all of those things that you talked

24   about; a signature, it requires the patient address, all

25   kinds of correct patient information.  It has to be signed

CATIZONE - CROSS

1    by the doctor in person on the same day it's issued.  Right?

2    A    Yes, sir.

3    Q    If it's missing one of those requirements or two of

4    those requirements, you're saying that that is illegal?

5    A    I don't think I ever testified to that.

6         But to answer your question, the prescription must be

7    complete.  And if the information was missing, it would be

8    the pharmacist's responsibility to get that information

9    before they dispensed it.

10   Q    Can a -- can someone from the doctor's office call a

11   pharmacy and call in a prescription at the doctor's

12   direction for a Schedule III controlled substances?

13   A    Yes, sir.

14   Q    And there's no requirement that the person making that

15   phone call from the doctor's office have any particular

16   medical training.  Is that true?

17   A    Yes, sir.

18   Q    You testified earlier about the amounts of hydrocodone

19   or controlled substances that are considered normal for a

20   pharmacy to be issuing on a regular basis as a percentage of

21   their prescriptions.  Right?

22   A    Yes, sir.

23   Q    Are you familiar with the fact that there are

24   particular clinics or hospitals that specialize in pain

25   management?

CATIZONE - CROSS

1  A    Yes, sir.

2  Q    Nationwide that's a fairly common situation.  Right?

3  A    Yes, sir.

4  Q    Some can be very large, very sophisticated hospitals

5  with a wide array of services, some may be smaller, but

6  there are a variety of practices that specialize in pain

7  management.  That's what they do.

8  A    Yes, sir.

9  Q    And some of those hospitals or clinics can have

10 dispensaries associated with them?

11 A    I'm not sure what you mean by "dispensary," sir.  Are

12 you referring to pharmacies?

13 Q    Yes.

14 A    Yes, sir.

15 Q    They can either be a pharmacy that is physically

16 connected to the same practice or inhabit a space that's

17 next to it or even be part, owned by the same organization?

18 A    Yes, sir.

19 Q    Is that fair to say?

20      Would you agree with me if you had a pharmacy that was

21 physically connected to a pain management hospital, that it

22 would stand to reason that a large number of the

23 prescriptions being filled at that pharmacy would be pain

24 medication?

25 A    If the other requirements were met by the state for

CATIZONE - CROSS

1  pain management that requires additional safeguards and

2  verifications that that pain management pharmacy was

3  involved in, then I would say yes.  If those were absent,

4  then it would draw suspicion and that pharmacy would be

5  investigated.

6  Q    I guess what I'm trying to get, your answer is:  If

7  there's a pharmacy that's connected to a pain management

8  hospital, you're going to see a lot of pain medications

9  dispensed at that pharmacy.  Correct?

10 A    Yes, sir.  Yes, sir.

11 Q    That may be a much higher percentage than usual at an

12 average pharmacy.  Right?

13 A    Yes, sir.

14 Q    It may, in fact, be the bulk of what they do?

15 A    Yes, sir.

16 Q    Now, let me ask you a quick hypothetical here.

17      Imagine that you are given a prescription to fill, and

18 you were aware the prescription had been filled out in the

19 following manner:

20      A patient had arrived at some sort of clinic; had

21 presented a nurse with a diagnosis, a piece of paper that

22 just had a diagnosis written on it, and a list of

23 medications that they were taking.  And that piece of paper

24 had been signed by a nurse at a former doctor's office that

25 they had -- that they had been treated at.

CATIZONE - CROSS

1     And they presented that piece of paper to the nurse,

2  and the nurse looked at the list of medications, wrote out

3  prescriptions for the same medications, without any kind of

4  further interaction with the prior doctor, without looking

5  at any records or anything of that nature; signed the

6  doctor's name, and then their own name, and then called or

7  faxed that prescription in to the pharmacy.

8     Is that a prescription that you would willingly fill as

9  a pharmacist?

10 A    No, sir.

11 Q    And why not?

12 A    I believe that that would violate the Medical Practice

13 Act because the nurse was engaged in the practice of

14 medicine and not simply acting as the doctor's agent.  There

15 was no validation that that information the patient provided

16 actually came from a legitimate doctor.  There was no

17 validation of that prescriber/patient relationship.  And if

18 the pharmacy filled that, they would be filling a

19 prescription that was invalid.

20 Q    Let me add one more fact to that hypothetical, if I

21 can.

22     That there is a doctor who is on staff at the clinic

23 but was not present for any of that interaction, who most of

24 the time is not present but comes in periodically to check

25 the work of that particular nurse, and could change the

CATIZONE - CROSS

1  prescription or change the course of treatment if the doctor

2  wanted to.  Would that change your view of that?

3  A    No, sir.

4           MR. ADOLF:  Nothing further, Your Honor.

5           THE COURT:  Mr. Foster.

6           MR. FOSTER:  Thank you, Your Honor.

7                    **CROSS EXAMINATION**

8  **BY MR. FOSTER**

9  Q    Mr. Catizone, did you look at two different entities in

10  his case, Your Online Doctor and Woody's Pharmacy?

11  A    Yes, sir.

12  Q    So Woody's Pharmacy was a pharmacy.  Correct?

13  A    Yes, sir.

14  Q    And Your Online Doctor was not.  Correct?

15  A    Yes, sir.

16  Q    And your curriculum vita indicates that you've

17  testified four times in federal court previous to today?

18  A    Yes, sir.

19  Q    And that's always been for the prosecution.  Correct?

20  A    Yes, sir.

21  Q    And your association is just that, it's an association;

22  it's not a government agency.  Correct?

23  A    Yes, sir.

24           MR. FOSTER:  I have no further questions.

25           THE COURT:  Any redirect?

CATIZONE - CROSS

1    MR. WASHINGTON:  Nothing, Your Honor.  Thank you.

2    THE COURT:  You may step down and be excused.

3    Call your next witness.

4    MS. RIKARD:  The United States recalls

5    Special Agent Raj west.

6                    **RAJENDER WEST**

7    being duly sworn, was examined and testified as follows:

8                    **DIRECT EXAMINATION**

9    **BY MS. RIKARD**

10   Q    Okay.  Good morning, sir.

11        Could you please remind us of your name and what you

12   do.

13   A    Good morning.  My name is Rajender J. West.  My first

14   name is spelled R-A-J-E-N-D-E-R.

15        I'm employed as a criminal investigator for the

16   Internal Revenue Service.

17   Q    And Agent West, have you been participating in the

18   investigation of Youronlinedoctor.com and Woody Pharmacy?

19   A    Yes, I have.

20   Q    And as part of that investigation, are you familiar

21   with the name, "Todd Strickland"?

22   A    Yes, I am.

23        MS. RIKARD:  Your Honor, at this time we move to

24   admit Government's Exhibit 31, 32 and 33.  The authenticity

25   and admissibility have been stipulated to by defense

                            WEST - DIRECT

1    counsel.

2              THE COURT:  Any objection?

3              MR. TATE:  No objection.

4              MR. GSELL:  No, Your Honor.

5              MR. FOSTER:  No, Your Honor.

6              THE COURT:  Let it be admitted.  Let those

7    documents be admitted.

8              (Government's Exhibit No. 31, 32, 33 received.)

9              MS. RIKARD:  Thank you, Your Honor.

10             May I approach with actually two pieces of

11   evidence are physical evidence?

12             THE COURT:  You may.

13   **BY MS. RIKARD**

14   Q    Agent West, do you recognize these items?

15   A    Yes, I do.

16   Q    Have you received these items in connection with your

17   investigation of Youronlinedoctor.com and Woody Pharmacy?

18   A    I have reviewed these items.

19   Q    If you would, please, describe for us now what

20   Government's Exhibit 31 is.

21   A    Government's Exhibit 31 is a pill bottle from

22   Woody Pharmacy.  The customer name is Todd Strickland.

23   Q    And what was prescribed in that pill bottle?

24   A    The quantity is 120.  The drug is hydrocodone, with an

25   abbreviation for acetaminophen 10/500 milligram tablets.

WEST - DIRECT

1   Q     Who was the doctor listed?

2   A     The doctor listed is "Dr. Porfirio Orta," and it just

3   has "Rosa" on the end.

4   Q     Which pharmacy did that pill bottle come from?

5   A     Woody Pharmacy.

6   Q     Agent, I'll ask Ms. Neill to put on your screen in

7   front of you what has been previously marked as Government's

8   Exhibit 9F.

9         Agent West, do you see a prescription number listed on

10  that pill bottle?

11  A     Yes, I do.

12  Q     What is that number?

13  A     The number is 52456.

14  Q     And do you see a prescription number on the screen in

15  front of you?

16  A     I do.

17  Q     What is that number?

18  A     I actually see two.  I see the one on top is 52456, and

19  the one on the bottom is 52457.

20  Q     For the record, you have been looking at Government's

21  Exhibit 9F --

22  A     Yes.

23  Q     -- is that right?

24  A     Correct.

25         MS. RIKARD:  If you could please put up

WEST - DIRECT

1    Government's Exhibit 33 on the screen.

2    Q    Agent West, let's take a look now at page 1 of

3    Government's Exhibit 33, and then page 2.

4         Do you do a Rx number listed on here?

5    A    Yes, I do.

6    Q    What is that number?

7    A    52456.

8    Q    Agent West, I previously showed you what had been

9    marked as Government's Exhibit 32.  Do your do your that?

10   A    Yes, I do.

11   Q    Is this a calendar?

12   A    It is.

13   Q    I'm going to show you a few pages from the calendar on

14   the Elmo, and it should appear on your screen.

15        Agent, what month and year is this?

16   A    In the top left-hand corner of the calendar it says

17   "July 2005."

18   Q    Directing your attention to July 7th, what do you see

19   written there?

20   A    On July 7th here I see the word "Woody" with a

21   telephone number listed as "(704)799-6697," and the words

22   of, the reference  "0 refills."

23   Q    Flipping to the next page, what month is this?

24   A    This is August 2005 as indicated in the top left-hand

25   corner of the calendar.

WEST - DIRECT

1  Q    And directing your attention to August the 5th, what do

2  you see there?

3  A    I see the word "Woody" at the top.  I see a telephone

4  number listed of "(704)799-6697."

5  Q    Do you see two numbers listed below that?

6  A    I do.

7  Q    What are those numbers?

8  A    "48762" and "48763".

9  Q    What month is this?

10  A    September 2005.

11  Q    And directing your attention to September 23rd, what do

12  you see listed there?

13  A    On the 23rd I see "Woody 23" and a number listed

14  underneath, "48762," and a telephone number listed of

15  "(704)799-6697," and below that there is the number "2".

16  Q    That No. 48762, if you can keep that in your head

17  momentarily.

18        MS. RIKARD:  And Ms. Neill, if we could look at

19  Government's Exhibit 9E, please.

20  Q    Agent, you saw on the calendar 48762.  Do you see that

21  number on Government's Exhibit 9E?

22  A    I do.  Right here (indicating) "48762" at the top.

23        MS. RIKARD:  Thank you.  Nothing further.

24        THE COURT:  Mr. Gsell, any cross?

25        MR. GSELL:  No, Your Honor.  Thank you.

WEST - DIRECT

1      THE COURT:  Mr. Tate?

2          MR. TATE:  Yes.  Briefly, Your Honor.  If we could

3   have Ms. Neill bring up Government's Exhibit 9F.

**CROSS EXAMINATION**

5   **BY MR. TATE**

6   Q    Agent West, you have been present in the courtroom

7   throughout this trial.  Is that right?

8   A    That's correct, sir.

9   Q    And did your investigation reveal that this particular

10  prescription was handwritten, filled out, and faxed by

11  Stephen Giacobbe?

12  A    Throughout the course of my investigation, I have

13  become familiar with Mr. Giacobbe's handwriting.  And

14  neither the top portion with the customer information, nor

15  the bottom portion where the drugs are listed, resembles his

16  handwriting.

17  Q    Do you recognize based on your investigation whose

18  handwriting that is?

19  A    I couldn't say for certain, sir.

20  Q    Well, do you know whether this prescription was an

21  original or was it a photocopy, particularly the signature

22  on the bottom of the document?

23  A    Could I ask you to clarify your question a little bit,

24  sir?

25  Q    Well, are you able to determine, based on your

WEST - CROSS

1   investigation, whether the signature for the doctor was an

2   original signature or was it a signature that had been

3   photocopied?

4   A    The prescription that I reviewed during the course of

5   my investigation, the signature did not appear to be an

6   original signature, no, sir.

7   Q    It appeared to be a photocopied?

8   A    Yes, it did.

9           MR. TATE:  No further questions.

10          THE COURT:  Mr. Foster.

11                      **CROSS EXAMINATION**

12  **BY MR. FOSTER**

13  Q    Agent West, if you could pull up Exhibit 32, please.

14          MS. RIKARD:  Mr. Foster, it's not in Sanctions.

15  We just have the hard copy.

16          MR. FOSTER:  Turn to the page for July.  Actually,

17  I can do this without you pulling it up.  I'll just ask

18  questions.  Thanks.

19  Q    Agent West, you looked at the calendar?

20  A    Yes, I did.

21  Q    There's other notations on the calendar of different

22  dates for other online providers of pharmacy services.

23  Correct?

24  A    That's correct.

25  Q    Such as Medicom?

WEST - CROSS

1    A    Yes, sir.

2    Q    And Medipharm?

3    A    Yes, sir.

4    Q    And even that one said "refill Target" or something

5    like that?

6    A    I think so, yes, sir.

7    Q    So those, in your investigation, indicated that

8    throughout those months, July through December, there were

9    other pharmacies on that calendar along with Woody's.

10   Correct?

11   A    There are other notations made on that calendar, yes,

12   sir.  Absolutely.

13            MR. FOSTER:  I have no further questions.

14            THE COURT:  Any redirect?

15            MS. RIKARD:  No, Your Honor.  May we publish

16   Government's Exhibits 31 and 32 to the jury?

17            THE COURT:  You may.

18            Agent West, you may step down.

19            May I see the lawyers at sidebar?

20            (Sidebar conference reported as follows:)

21            THE COURT:  Do you have any witnesses?

22            MS. RIKARD:  We do not.

23            THE COURT:  Very well.  Do you all -- how long

24   will the Rule 29 motions be?

25            MR. TATE:  Five minutes.  I'll make a motion and

WEST - CROSS

1    there's a lot of counts if we don't cover them in groups.

2              THE COURT:  I think what we ought to do is take a

3    morning break after this publishing process is over and hear

4    from defense counsel.  We'll see where we are at that point.

5              (Sidebar conference concluded.)

6              THE COURT:  Does the government have any other

7    witnesses?

8              MS. RIKARD:  No, Your Honor.  The United States

9    rests.

10             THE COURT:  Members of the jury, this is a good

11   time for our morning break.  I know we've only been going at

12   it for a little over an hour, but we're going to take a

13   15-minute break at this time.  Keep an open mind until you

14   hear all the evidence in the case.  Don't talk about the

15   case during the break, and we'll see you at 11:30.

16             (Jury leaves courtroom at 11:17 a.m.)

17             THE COURT:  I'd like to hear from any defendants

18   any motions at this time.

19             MR. GSELL:  Thank you, Your Honor.

20             At this time on behalf of Ms. Giacobbe we would

21   make a motion under Rule 29 for judgment of acquittal as to

22   all counts.

23             The argument, Your Honor, is that this government

24   has failed to provide sufficient information from which a

25   jury could find beyond a reasonable doubt that Ms. Giacobbe

1    violated the laws that she's charged with breaking.

2            It really boils down to a nutshell, Your Honor:

3    The government has failed to prove, one, the conspiracy that

4    Ms. Giacobbe and the other defendants entered into an

5    agreement to violate the federal law with regard to the

6    distribution of the prescriptions in this situation.

7            With regard to the substantive counts, Your Honor,

8    there's been no evidence that the prescriptions are

9    themselves invalid.

10            We heard testimony today that at the time with

11   which Ms. Giacobbe is charged with these matters, there was

12   not a requirement under federal law that there be a

13   face-to-face consultation.  That law has only recently come

14   about, and she is not charged with any offenses from the

15   time the Haight law took effect.

16            In addition, Your Honor, we have heard testimony

17   with respect to prescriptions III substances, which in fact

18   she is charged with under the Bill of Indictment, those

19   prescriptions could, in fact, be called in, Your Honor; and

20   we heard testimony this morning those prescriptions could be

21   called in by a staff member with no medical training.

22            In essence, that's what the government is trying

23   to prove here, Your Honor, and as testified by their own

24   expert, that does not violate the law.

25            The government has simply failed to prove beyond a

1   reasonable doubt that what Ms. Giacobbe did is, in fact,

2   illegal under federal laws.  Whether it's a violation of

3   state law, that's immaterial because she is not charged with

4   violating any state laws.  As it stood at the time she

5   engaged in this conduct, the federal law simply did not

6   require a face-to-face consultation, and a prescription for

7   the nature of the substances that were being prescribed in

8   this manner simply could have been done orally on the

9   telephone.

10          So our position, Your Honor, is that the

11  government has not proved their case, each and every count,

12  with sufficient evidence to show beyond a reasonable doubt

13  that she is, in fact, guilty, and we would ask for a

14  judgment of acquittal as to all counts.

15          THE COURT:  Mr. Tate.

16          MR. TATE:  Thank you, Your Honor.

17          On behalf of Dr. Orta, we move for judgment of

18  acquittal on Count One.

19          Considering the evidence in this case viewed in

20  the light most favorable to the government, which I believe

21  is the standard, there's insufficient evidence that would

22  allow a reasonable jury to conclude beyond a reasonable

23  doubt that Mr. Orta had an agreement or partnership with the

24  other listed defendants to violate the Controlled Substances

25  Act; specifically 21 U.S.C. 841.

1    The evidence in this case, Your Honor, really is

2    that there's an agreement to exclude Dr. Orta from their

3    activities.  There was plenty of witnesses that testified

4    that they, without his authorization, faxed his --

5    photocopies of his signatures, failed to consult with him

6    prior to doing that, as was outlined in their original

7    working agreement, which we maintained was lawful.

8    But to the extent it was unlawful, Dr. Orta was

9    not a part of that agreement.  In fact, they excluded him to

10   his detriment.

11   There was e-mails about talking, not giving him

12   records, not letting him know this.  There was testimony

13   from Stephen Giacobbe, Celeste Otiko, and others in this

14   trial that they did so without Dr. Orta's knowledge, and it

15   was a purposeful attempt to not tell him what was going on.

16   He was viewed -- I believe one witness, Mr. Giacobbe,

17   testified that it was true that they viewed that Dr. Orta

18   bogged down the process, therefore they sought to go around

19   him and issue these prescriptions unbeknownst to him, so he

20   could not possibly be in agreement with people working

21   against him.

22   Count Three through Six, we move for a judgment of

23   acquittal as a matter of law.

24   Those counts charge distribution of controlled

25   substances, prescription drugs, to Robin Bartlett.  And I

1  believe again the evidence viewed in the light most

2  favorable to the government is that Dr. Orta had absolutely

3  nothing to do whatsoever with those prescriptions.  They

4  were photocopied.  Never talked to the patient.  They were

5  faxed in unbeknownst to him.

6          The same argument would apply for the Count Seven

7  which involved a prescription for Ryan Kastner.

8          Now, moving on to Counts Eight through Nineteen,

9  all of these involve co-defendant Kathleen Giacobbe,

10  prescriptions to herself.  And there's absolutely no

11  evidence, considered in the light most favorable to the

12  government, that Dr. Orta had anything whatsoever to do with

13  issuing those prescriptions.  And I believe the evidence is

14  overwhelming that these were faxed, photocopies of

15  prescriptions he did not take part in and that were faxed in

16  unbeknownst to him.  And there's no evidence to the

17  contrary.

18          So we'd move for judgment of acquittal on Counts

19  Eight through Nineteen.

20          And again Counts Twenty and Twenty-One,

21  prescriptions that Stephen Giacobbe, who testified here,

22  admitted that he did these two and many more prescriptions

23  without Dr. Orta's knowledge and on his own accord.  He had

24  no role whatsoever in what Stephen Giacobbe did on his own.

25          Counts Twenty-Two through Twenty-Five involve a

1    woman by the name of Carol Hess. And again, as

2    Mr. Stephen Giacobbe testified and identified for the jury a

3    prescription that he said he filled out himself for Ms. Hess

4    and sent to him; and again a photocopy of Dr. Orta's

5    signature and there's no evidence suggesting he was

6    complicit in any way in, you know, filling out that

7    prescription.

8            The same would apply for Counts Twenty-Six through

9    Twenty-Nine also involving Carol Hess.

10           Counts Thirty through Thirty-Three again involve

11   Jeanette Becker. These are 2004 prescriptions, and I

12   believe it was Ms. Dudley who testified about these. And

13   again the evidence suggests she did this without consulting

14   Dr. Orta whatsoever. So I just don't see the link where any

15   evidence the government has put on that would link him to

16   the illegal conduct of Ms. Dudley.

17           Counts Thirty-Four through Thirty-Seven involve

18   David Peloff. Again, there's no evidence whatsoever, viewed

19   in the light most favorable to the government, that would

20   tie Dr. Orta to the issuance of those prescriptions. Our

21   position is that they were fraudulent; that it's part of the

22   agreement to exclude him. And, therefore, he cannot as a

23   matter of law be found guilty of those counts.

24           Counts Thirty-Eight through Forty-One involve 2005

25   prescriptions to a Kathy Labonte. Again, the evidence in

 1    this case was that those were photocopied signatures of

 2    Dr. Orta, and there's no evidence suggesting that he was

 3    complicit in any way in the distribution of those

 4    prescriptions.  And, in fact, they were fraudulent use of

 5    his signature.

 6         Counts Forty-Two through Forty-Four involve Todd

 7    Strickland.  And again the evidence here is that employees

 8    of YOD simply photocopied his signature unbeknownst to him

 9    and issued these prescriptions without his knowledge.  And

10    so there's been no logical link between their conduct and

11    anything that Dr. Orta did.

12         Counts Forty-Five through Forty-Seven again

13    involve Todd Strickland.  The same argument applies there

14    for brevity, Your Honor.

15         Counts Forty-Eight through Fifty-One involve

16    Anna Parsons.  And these are, again, 2004 prescriptions,

17    involving photocopied signatures of Dr. Orta.  There's no

18    evidence whatsoever that he was consulted, knew about it,

19    agreed, passively, in any way to the conduct that was taken

20    by a YOD employee on their own.

21         Counts Fifty-Two and Fifty-Three involve Scott

22    Coletto who testified here.  And again I think his testimony

23    was that he never spoke to Dr. Orta at all.  And so the fact

24    that someone photocopied his signature, sent in a

25    prescription unbeknownst to Dr. Orta, in no way implicates

1  him in that otherwise would be illegal or fraudulent

2  conduct.

3          Counts Fifty-Four through Sixty-Three involves

4  Celeste Otiko.  And she -- her testimony was unequivocal

5  that this involved -- okay.  He's not charged in that.

6          THE COURT:  Seventy-Seven is the next one that

7  Dr. Otiko --

8          MR. TATE:  Yes.  Seventy-Seven.  These involve

9  prescriptions to Kathleen Giacobbe.  We would incorporate by

10  reference the earlier arguments I made with respect to those

11  prescriptions written out to Kathleen Giacobbe.

12          THE COURT:  Mr. Foster?

13          MR. TATE:  Anna Parsons.  Your Honor, again, I

14  think that there's also a factual gap in the government's

15  counts.  There was no evidence adduced at trial those

16  prescriptions were ever actually delivered to Anna Parsons.

17  We would add that to our argument.

18          THE COURT:  Very well.

19          MR. FOSTER:  I move under Rule 29 for judgment of

20  acquittal on Count One, the conspiracy count.  I would

21  maintain that there's no evidence from which a rational jury

22  could find beyond a reasonable doubt that my client ever

23  entered into an agreement with any of the named

24  co-conspirators or unnamed conspirators.  No evidence that

25  he entered into any agreement with them to unlawfully

1   distribute drugs; to do so other than for legitimate medical

2   purpose and in the usual course of professional practice.

3        The evidence was my client was associated with YOD

4   up until March 2004.  Most of the more illicit allegations

5   come thereafter.  The evidence is clear that the business

6   model that was known to the participants in that time frame

7   was one where it was believed that Dr. Orta was actually

8   reviewing the medical records and approving the

9   prescriptions before they went out the door.

10        As far as Counts Twenty-Two through Twenty-Five

11   involving Carol Hess, I would submit there's insufficient

12   evidence that my client, number one, issued those

13   prescriptions, and number two, that it was not for a

14   legitimate medical purpose.  She testified she was in pain.

15   She testified to the affliction she suffered from.

16        Counts Fifty-Four through Sixty-Three, these

17   involve Celeste Otiko, who also testified on the stand that

18   she did suffer from a variety of below-the-knee medical

19   problems that clearly would be in the scope of practice for

20   a podiatrist.  Clearly she indicated she was in pain.

21        I would submit therefore that there's insufficient

22   evidence that these prescriptions were issued other than for

23   a legitimate medical purpose and in the usual course of

24   professional practice.

25        Counts Sixty-Four through Seventy-Three regarding

1  Tamara Hester, I would submit on these counts there's

2  insufficient evidence again to show that these

3  prescriptions, that all of them were called in by my client;

4  and insufficient evidence that any of them were other than

5  for a legitimate purpose in the usual course of professional

6  practice.

7        Regarding Counts Seventy-Four through Seventy-Six

8  regarding Richard Bradley, I submit there's evidentiary

9  failure there to prove that Richard Bradley was the

10  recipient of these Schedule III substances, or that they

11  were purposely set in any way, shape or form by my client

12  outside the scope of his practice.

13        So I would request that the Court grant the Rule

14  29 motion on all counts.

15        THE COURT:  Thank you.  What says the government?

16        MS. RIKARD:  Thank you, Your Honor.

17        With regard to Ms. Giacobbe, the case law has

18  consistently held that a nonregistrant may still be

19  prosecuted in these types of prosecutions for either herself

20  distributing drugs unlawfully, or conspiring with

21  registrants to do so, or for aiding and abetting registrants

22  to do so.

23        The statistic that we have seen from Agent

24  Meuller, and from Agent West and June Howard, the experts,

25  the testimony from co-conspirators Libby Dudley, Stephen

1   Giacobbe and Celeste Otiko, all indicate this operation was

2   operating way outside the usual course of professional

3   practice.  That it was simply a distribution center for

4   hydrocodone and a few other controlled substances.  That

5   there was no involvement from an doctor whatsoever; that

6   that was not them elbowing him out as much as it was his

7   willing decision to remove himself from the process so that

8   presumably he couldn't be bothered and just receive his

9   weekly paycheck.

10         With regard to the substantive counts, we have had

11   testimony from co-conspirators Libby Dudley and Stephen

12   Giacobbe and Celeste Otiko identifying every person's

13   handwriting on those drug orders; that they were all

14   medically untrained and unauthorized, including the ones

15   written by Kathy Giacobbe.

16         With regard to the money laundering --

17         THE COURT:  Before you get there, what about

18   Forty-Eight through Fifty-One with respect to Anna Parsons?

19         MS. RIKARD:  Thank you, Your Honor.

20         First of all, we have testimony from Libby Dudley

21   and Stephen Giacobbe that Stephen Giacobbe was the one who

22   actually wrote that drug order for hydrocodone for

23   Ms. Parsons.  Stephen Giacobbe testified that he, of course,

24   had no medical training.  That he was simply a master's

25   student in a criminal justice program at the time, and does

1   not know how to write a prescription or especially how to

2   write a prescription for a controlled substance.

3           She was the witness that -- we intended call her

4   today but she still as pneumonia and could not travel.

5   However, we have been able to, through the computer

6   examiner, get in a copy of her questionnaire.  We also have

7   put into evidence the UPS records indicating that drugs were

8   actually shipped to her.  And we also have the testimony

9   from Jon Bentz, the pharmacist at Woody Pharmacy, who looked

10  at every single prescription charged in this case including

11  that of Anna Parsons, indicating that hydrocodone was

12  actually distributed to her.

13          THE COURT:  And with respect to Count Seventy-Four

14  to Seventy-Six with Mr. Bradley.

15          MS. RIKARD:  With regard to Mr. Bradley, the

16  testimony there is first of all from Dr. Meredith, that he

17  testified that simply the quantities alone and the frequency

18  with which they were prescribed is typically way outside a

19  podiatrist's scope of practice.

20          Ms. Hester also testified that to her knowledge

21  Richard Bradley was not receiving drugs from Chris Otiko or

22  Woody Pharmacy; that she was the only person receiving them.

23  That she would open up the box from Woody Pharmacy when it

24  arrived without necessarily looking at the addressee and

25  then consumed it from there.

1    Jon Bentz also looked at these prescriptions and

2  indicated they were called in by Chris Otiko.  He could tell

3  they were a call-in prescription, and he testified he does

4  not recall ever receiving a call-in other than from Chris

5  Otiko.  He does not recall any woman or anyone else

6  pretending to be Chris Otiko or someone working with him.

7  And the UPS records indicated that something was actually

8  shipped from the Woody's Pharmacy to Richard Bradley.

9    THE COURT:  With respect to the money laundering

10 counts.

11   MS. RIKARD:  Yes, Your Honor.

12   There we put into evidence the actual check

13 showing that was a financial transaction.

14   Agent West testified from the money traveled

15 between states and went from a bank in Vermont, Community

16 National, to a bank in North Carolina, BB&T.

17   On the checks themselves it wrote ship -- the memo

18 line read "shipping discount," indicating that it was

19 designed to -- that they were payments for the shipping

20 discounts.  We saw evidence of the website advertising a

21 shipping discount, and we heard Libby Dudley testify that it

22 was simply to drum up business and to further and promote

23 the business of the website to get some more customers.

24   THE COURT:  Thank you.

25   I'm required at this stage in the proceeding to

1    take the evidence in the light most favorable to the

2    government considering these Rule 29 motions.  And doing so,

3    I find that there is sufficient evidence on each of the

4    counts to put this case before the jury.  And so I would

5    deny each of the defendants' motions at this time.

6               I would like to discuss with defense counsel, each

7    one individually, whether they intend to put on evidence,

8    and to try to guesstimate the length of time remaining, the

9    defense evidence that might be put up.

10              MS. RIKARD:  Your Honor, before you get there, I

11   apologize for interrupting but I did want to clarify one

12   thing.

13              The government is not actually proceeding on Count

14   Seven-Seven through Eight.  Those were distributions coming

15   out of the Woody Pharmacy location in Denver, and we

16   elected, for brevity sake mostly and efficiency sake, to not

17   proceed on testimony there.  Those were Kathy Giacobbe

18   distribution counts charging Alvin Woody and Dr. Orta.

19   Those are Counts Seventy-Seven through Eighty.

20              THE COURT:  Seventy-Seven through Eighty are

21   counts that charge Dr. Orta.

22              MS. RIKARD:  We will be moving to dismiss those

23   counts at this time.  The earlier distributions to Kathy

24   Giacobbe, those are Counts Eight through Nineteen, we did

25   present evidence and do intend to proceed as planned.

1    THE COURT:  Very well.  I'll dismiss Counts

2  Seventy-Seven through Eighty.

3    MS. RIKARD:  Thank you.  And I'm sorry again for

4  interrupting.

5    THE COURT:  Mr. Gsell, do you intend to put on

6  evidence?

7    MR. GSELL:  Yes, Your Honor.  There were two

8  agents that were originally on Mr. Adolf's list, Agent

9  Paquette and Agent Whitesell, and after conversation, I have

10 decided to call them as witnesses for Mr. Giacobbe.  I would

11 anticipate probably no more than 20 minutes, 25 minutes for

12 the two of them.

13    THE COURT:  Thank you.

14    Do you wish for me to examine your client with

15 respect to her constitutional right to testify or not to

16 testify?

17    MR. GSELL:  Could I just have one moment, Your

18 Honor.

19    THE COURT:  Sure.

20    (Mr. Gsell speaks with his client.)

21    MR. GSELL:  Your Honor, at this time Ms. Giacobbe

22 does not wish to be advised by the Court.

23    THE COURT:  Very well.

24    Mr. Gsell, for the record, have you explored,

25 without telling me anything about your conversation with

1   your client, but have you explored the options with your

2   client about the choice that she has to testify or not to

3   testify?

4           MR. GSELL:  Yes, Your Honor.  She is aware that is

5   her right under federal law, and she has chosen to exercise

6   the right not to testify on her own behalf in this matter.

7           THE COURT:  Very well.  Mr. Tate, do you

8   anticipate putting on evidence?

9           MR. TATE:  Yes, Your Honor.  Obviously we're going

10  to be calling an expert.  We're going to be calling

11  Agent Hill.  We're going to be calling a nurse, and Agent

12  Woods -- I keep calling her an agent -- I think she's an

13  employee of the FBI, not an agent.  Ms. Woods.  We

14  understand she is available.

15          As for Dr. Orta, we have not consulted with him

16  but he has not decided whether he will testify.

17          THE COURT:  Very well.  And I'm inclined to give

18  you, if you want, ten minutes to open before the

19  presentation of your evidence with respect to the forecast

20  of evidence.  I wouldn't want any legal argument, but the

21  forecast of the evidence with respect to the affirmative

22  defenses that were alleged in your motion.

23          Do you wish to exercise that?

24          MR. TATE:  Yes, Your Honor.  Certainly, and

25  procedurally how I think that should play out is Mr. Gsell

1    would put on his witnesses.  Mr. Adolf will call an expert

2    and another witness, and then prior to the witnesses that

3    are relevant to that defense I would do opening and call

4    them.

5             THE COURT:  I think what I'll do, Mr. Tate, is

6    allow -- after Mr. Gsell puts on the defense case for

7    Ms. Giacobbe, I'll allow you a brief ten minutes to open on

8    the affirmative defenses.

9             MR. TATE:  Okay.

10            THE COURT:  And you mentioned that that is in

11   addition to any other evidence you're putting up that you

12   previously spoke about.

13            MR. TATE:  Thank you, Your Honor.

14            THE COURT:  I think we'll link that to ten

15   minutes.

16            I want to caution counsel there's a whole lot, in

17   my opinion argument, in the opening statements at the

18   beginning of the case.  I don't want legal argument in

19   opening statement.

20            MR. TATE:  Certainly.

21            THE COURT:  And any guesstimate on the length of

22   time that your direct of these witnesses might take?

23            MR. TATE:  I'm going to let Mr. Adolf address the

24   expert because --

25            MR. ADOLF:  Judge, I would think for the expert it

1  would be half an hour or less.  The other witnesses, the

2  nurse, ten minutes.  And then there's the affirmative

3  defense that was discussed.

4          THE COURT:  I'm not holding you to any estimates

5  but for planning purposes I'm trying to get a feel.

6          Mr. Foster, how about you?

7          MR. FOSTER:  Your Honor, I intend to call two

8  witnesses that I've ascertained during the progress of the

9  trial; one is Stacy Rossi-Kollar, who is flying in from

10 California and not arriving until this evening.  I initially

11 expected the government's case to last further into today

12 and my co-defendants' case to last through today.

13          And then I have another witness, Dan Dunlap, who

14 is going to be available -- the last time I spoke with

15 him -- would be 1:00 tomorrow afternoon.  Try to get him

16 here in the morning if I can tomorrow.

17          I've advised my client at length about his choice

18 about whether he's going to testify or not, and he fully

19 understands everything.  We continue to discuss that, Your

20 Honor.

21          MR. ADOLF:  One more matter.

22          We had hoped -- Your Honor may recall from my

23 opening that there were a number of patient files, roughly

24 6,000 patient files, found on Dr. Orta's computer at home.

25          I was hoping to get that information in through

1  the DEA computer forensic person, who is going to be

2  testifying for the defense.

3          We have been in contact with her.  I just got a

4  message back.  I'm not sure that she's going to have time to

5  review that, depending on how the day goes.  And if that's

6  the case, I may have to put on my computer forensics person

7  from my office just to establish basically a chain of

8  custody of the patient records, just where they were found

9  and how many there are.

10          THE COURT:  Have you explored a stipulation on

11 this?

12          MR. ADOLF:  I have not, Judge.

13          THE COURT:  Why don't you do that at some time

14 before we come back this afternoon.

15          MR. ADOLF:  Very good.

16          THE COURT:  It might just help.

17          All right.  Well, let me -- anything else before

18 we call the jury back?

19          MR. WASHINGTON:  Judge, might we be allowed to

20 have a short break just to use the restroom?

21          MR. GSELL:  I concur.

22          THE COURT:  We have agreement on an issue in this

23 case among counsel, we can defer to that.  So we'll take

24 another ten minutes and be ready for the jury at five to

25 12:00.

1    (Recess taken.)

2    THE COURT:  Are you ready for the jury?

3    MR. GSELL:  Thank you, Your Honor.

4    THE COURT:  All right.  Call the jury.

5    (Jury enters courtroom at 11:57 a.m.)

6    THE COURT:  Mr. Gsell.

7    MR. GSELL:  At this time Mr. Giacobbe would call

8  Aprile Whitesell.

9                    **APRILE WHITESELL**

10  being duly sworn, was examined and testified as follows:

11                    **DIRECT EXAMINATION**

12  **BY MR. GSELL**

13  Q    Good morning, ma'am.  Can you state your name for the

14  record.

15  A    Aprile Whitesell.

16  Q    Ms. Whitesell, my name is Scott Gsell.  I represent

17  Kathy Giacobbe.  She was the owner of Your Online Doctor.

18        How are you currently employed?

19  A    I'm currently employed with the Drug Enforcement

20  Administration.

21          THE COURT:  Can you bend that microphone closer?

22  Thank you.

23  Q    Just so that everybody can hear that, can you please

24  state how your currently employed?

25  A    I work with the Drug Enforcement Administration.

WHITESELL - DIRECT

1  Q    What do you do for the DEA?

2  A    I am a diversion investigator.

3  Q    Can you tell the jury what a diversion investigator

4  does?

5  A    I handle regulatory investigations approving

6  individuals for licensure who handle controlled substances,

7  and also do criminal work on those individuals also.

8  Q    Okay.  And were you so employed back in February of

9  2006?

10 A    Yes, sir.

11 Q    Okay.  And are you familiar with Your Online Doctor?

12 A    Yes.

13 Q    And how are you familiar with Your Online Doctor?

14 A    I conducted, I guess, an undercover sale; tried to

15 purchase controlled substances from them during that time.

16 Q    Okay.  And in fact, didn't you access their website?

17 A    Yes, I did.

18 Q    Okay.  And you, in fact -- well, did you print out the

19 questionnaire?

20 A    Yes.

21 Q    Did you fill it out?

22 A    Yes, I did.

23 Q    And did you use your real name?

24 A    No.

25 Q    Did you use a fake name?

WHITESELL - DIRECT

1  A    Yes.

2  Q    Okay.  And do you recall what you wrote down as far as

3  what your previous medications were?

4  A    No, sir, I don't recall.

5  Q    Okay.  If I showed you that questionnaire, would that

6  help you refresh your recollection?

7  A    Yes.

8           MR. GSELL:  May I approach the witness, Your

9  Honor?

10          THE COURT:  You may.

11 Q    There are multiple pages.  I'll ask you to take a look

12 at that, read it over, and let me know when you're finished

13 with that.

14          THE COURT:  Just for identification purposes, can

15 we give that a Giacobbe number?

16          MR. GSELL:  Yes.  We'll give that Defendant

17 Giacobbe 1.

18          THE COURT:  Thank you.

19          THE WITNESS:  (Witness complies.)

20          The only thing I need to make a correction on in

21 this is that --

22          THE COURT:  Ma'am, the question from the attorney

23 was:  Does that refresh your recollection?

24          THE WITNESS:  Yes.

25 **BY MR. GSELL**

WHITESELL - DIRECT

1    Q    Okay.  So you recognize that document?

2    A    I recognize the document.

3    Q    And what is that document?

4    A    This is the document that we pulled off of the online

5    pharmacy.

6    Q    Is that the document that you submitted?

7    A    Yes, it is the document that was submitted.

8    Q    By reviewing that, it has refreshed your recollection?

9    You now recognize that document?

10   A    Yes.

11   Q    Now, I direct your attention to the face page of it.

12   About one-third of the way down it says "date of last

13   examination."  Do you see that?

14   A    On the first page?

15   Q    Yes.

16   A    Yes.

17   Q    And can you tell the jury what date is placed in this?

18   A    I believe it says "January 2001."

19   Q    Okay.  And you submitted this questionnaire in February

20   of 2006?

21   A    Correct.

22   Q    Okay.  And right next to that it says "reason for

23   examination."  Do you see that?

24   A    Yes.

25   Q    What did you put down?

WHITESELL - DIRECT

1    A    "Flu."

2    Q    And the next line down it says "previous medications."

3    A    Uh-huh.

4    Q    What did you put in there?

5    A    "Hydrocodone."

6    Q    And next to that it says "current medications."

7    Correct?

8    A    Correct.

9    Q    And what did you put down?

10   A    "None.""

11   Q    Okay.  And directly below "current medication," it says

12   "What medications are you requesting and why."  Correct?

13   A    Yes.

14   Q    And what did you put down?

15   A    Just hydrocodone.

16   Q    Okay.  Now, I'm going to direct your attention to the

17   bottom third of that face page.  Do you see the box where it

18   says, "What is your past surgical history?"

19   A    Yes.

20   Q    And what did you put in there?

21   A    "None."

22   Q    And to the right of that it says "previous occasion

23   when you were hospitalized."  Do you see that?

24   A    Yes.

25   Q    And what did you put in there?

WHITESELL - DIRECT

1   A      "None."

2   Q      Okay.  And the next line down it says, "Do you consider

3   yourself to be in good health?"  Correct?

4   A      Correct.

5   Q      What did you put down?

6   A      "Yes.""

7   Q      To the right of that it says, "Explain."

8   A      Correct.

9   Q      What did you put in?

10  A      "I feel pretty healthy."

11  Q      You accessed the website and printed this out.  Is that

12  correct?

13  A      Correct.

14  Q      Okay.  And then you filled it out.  Is that correct?

15  A      I did not personally fill it out.

16  Q      Okay.  Who did fill it out?

17  A      DI Gary Linder filled it out.

18  Q      Okay.  And after it was filled out, what did you do

19  with that questionnaire?

20  A      We faxed it back to the company.

21  Q      Faxed it back to?

22  A      The online -- the fax where they gave us to fax it back

23  to Your Online Doctor.

24  Q      Okay.  Did you submit any medical records with that

25  questionnaire?

WHITESELL - DIRECT

1  A    I don't recall.

2  Q    Okay.  Do you recall whether or not you submitted a fee

3  along with the questionnaire?

4  A    We did not.  As far as I remember, we did not submit a

5  fee at that time.

6  Q    Okay.  And did you ever -- did you ever hear back from

7  Your Online Doctor after you submitted that questionnaire?

8  A    No.

9  Q    So you never received hydrocodone from

10  Your Online Doctor?

11  A    No, sir.

12  Q    Did Your Online Doctor ever tell you why you weren't

13  receiving the hydrocodone as requested?

14  A    No.

15  Q    Was this your only attempt at -- well, strike that.

16       Was this the only time you submitted a questionnaire to

17  Your Online Doctor during your investigation?

18  A    We made another attempt.  I'm not sure if we submitted

19  a questionnaire at that time.

20  Q    Did you, in fact, make another attempt?

21  A    No.

22  Q    Somebody else in the DEA?

23  A    Another DI and I worked together on it.

24       MR. GSELL:  Okay.  I have no further questions.

25  Thank you, ma'am.

WHITESELL - DIRECT

1    THE COURT:  Any cross?

2    **CROSS EXAMINATION**

3    **BY MR. WASHINGTON**

4    Q    Good afternoon.

5         So you submitted incomplete documentation to the

6    Your Online Doctor website?

7    A    Yes.  Well, whatever was completed on this, that's what

8    we submitted.

9    Q    But you didn't include some things?

10   A    We -- I think we left off the last page, inadvertently

11   left it off, and then we later tried to fax it back to them.

12   Q    Okay.  Your request was -- didn't have the last page of

13   the questionnaire on it?

14   A    Correct.

15   Q    Didn't have any medical records that you recall?

16   A    That I recall.  Yes, sir.

17   Q    And didn't have any ID that you recall?

18   A    Correct.

19   Q    And so isn't it true, ma'am, that it's not that you

20   were turned down, you just never heard back from them?

21   A    Correct.

22   Q    So you don't know if they ever even received your

23   packet, do you?

24   A    No, I don't.

25        MR. WASHINGTON:  No further questions.

1    THE COURT:  Any redirect?

2    MR. GSELL:  Briefly, Your Honor.

3                    **REDIRECT EXAMINATION**

4  **BY MR. GSELL**

5  Q    To the best of your knowledge, ma'am, that

6  questionnaire was -- well, how did you return that document

7  to Your Online Doctor?

8  A    I faxed it to them.

9  Q    To the best of your knowledge, you dialed in the

10 correct fax number?

11 A    To the best of my knowledge, yes.

12    MR. GSELL:  Nothing further, Your Honor.  Thank

13 you.

14    THE COURT:  You may step down and be excused.

15    If you would hand that document back to Mr. Gsell

16 on your way out.

17    Call your next witness.

18    MR. GSELL:  Thank you, Your Honor.  At this time

19 we would came Christopher Paquette.

20                    **CHRISTOPHER PAQUETTE**

21 being duly sworn, was examined and testified as follows:

22                    **DIRECT EXAMINATION**

23 **BY MR. GSELL**

24 Q    Good morning, sir.  Can you please state your name.

25 A    Christopher Paquette.

PAQUETTE - DIRECT

1  Q    Paquette?

2  A    Paquette.

3  Q    My name is Scott Gsell.  I represent Kathy Giacobbe.

4  She used to own Your Online Doctor.  I do want to ask you

5  some questions today.

6       How are you presently employed?

7  A    I'm employed as a diversion investigator with the

8  United States Department of Justice, Drug Enforcement

9  Administration.

10 Q    Okay.  Were you so employed back an April 2006?

11 A    Yes, I was.

12 Q    Are you familiar with the company named

13 Your Online Doctor?

14 A    Yes, I am.

15 Q    And how are you familiar with Your Online Doctor?

16 A    Your Online Doctor was a business, a target of an

17 investigation of multiple DEA and FBI offices.

18 Q    Okay.  And were you personally involved in the

19 investigation of Your Online Doctor?

20 A    Yes, I was.

21 Q    Now, I'll take you back to April of 2006.  Did you have

22 the opportunity to visit the Your Online Doctor website?

23 A    I did.

24 Q    Okay.  And did you access the questionnaire?

25 A    Yes, I did.

PAQUETTE - DIRECT

1   Q    And did you print that out?

2   A    I did.

3   Q    Okay.  And did you fill out the questionnaire?

4   A    Yes, I did.

5   Q    Okay.  And what was the purpose of filling out the

6   questionnaire?

7   A    To attempt to obtain controlled substances from the

8   website.

9   Q    Okay.  Did you use your real name?

10  A    I did not.

11  Q    Okay.  Whose name did you use?

12  A    An assumed identity, an undercover identity.

13  Q    Okay.  And that's the name you put on the

14  questionnaire?

15  A    Correct.

16  Q    Okay.  And after filling out the questionnaire, did you

17  submit the questionnaire to Your Online Doctor?

18  A    Yes, I did.

19  Q    Did you submit any other documentation along with the

20  questionnaire?

21  A    I did.

22  Q    And what else did you submit?

23  A    I submitted medical records.

24  Q    Okay.  Were they your medical records?

25  A    They were not.

PAQUETTE - DIRECT

1  Q    Okay.  Do you know whose medical records they were?

2  A    I don't know whose medical records they were.

3  Q    Do you know what type of medical record they were?

4  A    I don't.

5  Q    So you don't know if they were doctor records?

6  A    I don't know.

7  Q    You wouldn't know if they were dental records?

8  A    I don't know.

9  Q    Okay.  Did you submit identification at that time?

10 A    Yes, I did.

11 Q    And whose identification did you submit?

12 A    A Connecticut driver's license and undercover assumed

13 name.

14 Q    And the name on that driver's license matched the name

15 on the questionnaire.  Correct?

16 A    Correct.

17 Q    Okay.  And did you send in the fee?

18 A    Yes, I did.

19 Q    Do you recall how much the fee was?

20 A    I don't.

21 Q    Okay.  And do you recall how you sent in the fee?  Was

22 it credit card or money order?

23 A    I believe it was a bank check.

24 Q    Okay.  Now, as a diversion investigator, you're not

25 allowed to just write checks for investigations.  Correct?

PAQUETTE - DIRECT

1  A    That's correct.

2  Q    Okay.  You have to get approval for that?

3  A    Yes.

4  Q    And did you get approval to get the check in this case?

5  A    Yes.

6  Q    Okay.  Now, on the questionnaire, you did not use your

7  correct address.  Right?

8  A    No.

9  Q    Okay.  Do you recall what address you used?

10 A    An undercover post office box in the city of Hartford,

11 Connecticut.

12 Q    Okay.  And is that a post office box you had to rent

13 because of this investigation?

14 A    Not specific to this investigation, no.

15 Q    Okay.  Is it just a post office box that you used for a

16 number of other investigations?

17 A    Yes.

18 Q    And did you tell your supervisors what you were doing

19 as far as putting that address down on the questionnaire?

20 A    Yes, sir.

21 Q    Okay.  So is it fair to say that the people above you

22 knew exactly what you were doing?

23 A    Yes.

24 Q    Okay.  Now, before coming into court today to testify,

25 did you review any documents or anything?

PAQUETTE - DIRECT

1  A    Well --

2  Q    Within the last week did you review any documents

3  pertaining to this case?

4  A    I briefly read over some investigative reports.

5  Q    Okay.  Do you recall which investigative reports you

6  reviewed?

7  A    There was one for an undercover telephone call placed

8  to Your Online Doctor; Report of Investigation of an

9  undercover telephone call placed to Woody Pharmacy.

10 Q    Okay.

11 A    And a Report of Investigation of the undercover -- the

12 attempted undercover purchase.

13 Q    Okay.  When you say "attempt," what do you mean?

14 A    The undercover purchase was not successful.

15 Q    Okay.  And do you recall why it was not successful?

16 A    Some e-mails were exchanged between Your Online Doctor

17 and my undercover e-mail address indicating that they did

18 not treat the condition which I had put down on the

19 questionnaire.

20 Q    Do you recall what condition you put down on the

21 questionnaire?

22 A    I believe it was chronic cough.

23 Q    And you say Your Online Doctor -- well, you submitted

24 the questionnaire.  Correct?

25 A    Correct.

PAQUETTE - DIRECT

1    Q    And along with all the appropriate documentation?

2    A    Yes.

3    Q    And did you hear back from Your Online Doctor shortly

4    after you had submitted the questionnaire?

5    A    No.

6    Q    Okay.  After not hearing from them, did you attempt to

7    make contact with them?

8    A    Yes.

9    Q    And how did you attempt to do that?

10   A    By telephone.

11   Q    Okay.

12   A    Or excuse me -- strike that.  Possibly e-mail.

13   Q    Okay.  And did you get a response back to that contact

14   at Your Online Doctor?

15   A    I did, via e-mail, yes.

16   Q    And what was that e-mail again?  Do you recall what you

17   were told by Your Online Doctor?

18   A    Verbatim, no.  However, essentially something companion

19   to the effect of, "We don't treat your condition, therefore,

20   we'll -- we'd like an address to be able to send your check

21   back."

22   Q    Okay.  And did you, in fact, get that check back?

23   A    Yes, I did.

24   Q    Okay.  Other than that attempt in April of 2006, did

25   you personally make any other attempts to obtain

PAQUETTE - DIRECT

1    prescriptions through Your Online Doctor?

2    A    No.

3    Q    Okay.

4         MR. GSELL:  I have no further questions, Your

5    Honor. thank you.

6         THE COURT:  Any cross?

7         MS. RIKARD:  Yes, sir.

8                    **CROSS EXAMINATION**

9    **BY MS. RIKARD**

10   Q    Mr. Paquette, you participated in the investigation of

11   Your Online Doctor and Woody Pharmacy.  Correct?

12   A    I did.

13   Q    And at some point in your investigation you came to

14   realize, or you came to learn that they were responsible for

15   the distribution of hydrocodone pills.  Correct?

16   A    Correct.

17   Q    But that's not what you were requesting.  Correct?

18   A    Correct.

19   Q    You were asking for hydrocodone syrup.  Right?

20   A    Correct.

21   Q    Which they didn't provide.  Right?

22   A    Correct.

23        MS. RIKARD:  Nothing further.

24        THE COURT:  Redirect?

25        MR. GSELL:  Briefly, Your Honor.

PAQUETTE - CROSS

1                          **REDIRECT EXAMINATION**

2    BY MR. GSELL

3    Q    On the questionnaire you submitted, did you list any

4    other complaints other than chronic cough?

5    A    Without reviewing the questionnaire, I do not recall.

6    Q    Do you recall indicating on the form that the cough led

7    to back pain?

8    A    I don't specifically recall on the form, but I believe

9    I did indicate that in my -- in an e-mail to

10   Your Online Doctor.

11   Q    Okay.  And even with that additional complaint,

12   Your Online Doctor did not provide you with a prescription.

13   Correct?

14   A    No, they did not.

15             MR. GSELL:  Okay.  Nothing further, Your Honor.

16   Thank you.

17             THE COURT:  You may step down and be excused.

18             MR. GSELL:  Nothing further at this time.

19             THE COURT:  Mr. Adolf, Mr. Tate.

20             MR. TATE:  Your Honor, may we approach at sidebar?

21             THE COURT:  Yeah.

22             (Sidebar conference reported as follows:)

23             MR. TATE:  I can do the opening statement, but

24   there are -- our first witness is being picked up from the

25   airport right now.  If the Court wanted to break for lunch,

PAQUETTE - CROSS

1    we can to that.  Just break now and do it when we --

2              THE COURT:  Why don't we get as much in as we can

3    because I planned this around this time frame.  Go ahead do

4    your opening statement, and then we'll take a break at that

5    point for lunch.

6              MR. TATE:  All right.  Thank you.

7              (Sidebar conference concluded.)

8              THE COURT:  Members of the jury, before

9    presentation of Dr. Orta-Rosario's defense, Mr. Tate is

10   going to make a brief opening statement to you about the

11   certain affirmative defenses, and then we're going to break

12   for lunch before we hear any additional witnesses.  So if

13   you would give Mr. Tate your attention at this time.

14             MR. TATE:  Thank you, Your Honor.

15             May it please the Court.  Counsel.  Ladies and

16   gentlemen of the jury.  I'm Kevin Tate.  I'm co-counsel for

17   Dr. Orta.

18             I want to talk to you a bit about the forecast I

19   would say of what I think the evidence will show after we

20   put on our case, and after considering this evidence, I

21   believe you'll render the only proper verdict, which is not

22   guilty.

23             The evidence will show that beginning in 2003, you

24   may have heard some of this, Dr. Orta took on a position as

25   a consulting physician with Your Online Doctor.  This was a

1   new business model involving the Internet.  His job was to

2   consult with this company reviewing medical records, and

3   give them advice on whether this person was eligible for a

4   prescription.

5           What you will hear is that at some point

6   Dr. Orta's pursuit to document, deny or reject patients, was

7   bogging down this business.  And you may have heard some of

8   that from the evidence already.

9           And what happened in turn was that they went

10  around Dr. Orta and started using his signature,

11  misappropriating it, making prescriptions to themselves and

12  others bearing his signature without consulting him.  The

13  evidence will show without a fact unequivocally that this

14  was without his knowledge.  And if he doesn't have this

15  knowledge of it, he can't be held guilty of that.

16          Following that, you'll learn that there was a

17  confidential informant unbeknownst to Dr. Orta, this woman,

18  who had been a long-time friend, was also a confidential

19  informant for the DEA.  He did not know that.

20          And during his consultations with this person he

21  basically relied on them, told them what it was that he was

22  doing.  And sooner or later he got in touch with a DEA

23  Diversion Investigator Tom Hill.  I'm calling him to the

24  stand.  You'll hear from him.

25          And Mr. Hill suspended Dr. Orta's certification,

 1   his DEA certification that you saw so much about.  And I

 2   believe I'm going to get the date right, it was around

 3   July 23rd, 2003.  Suspended.  He could no longer do

 4   business; cannot write prescriptions.

 5          And the rouse that the investigator gave him for

 6   suspending his certificate was that he had moved from

 7   Wisconsin to Michigan, and that his new address had not yet

 8   been registered so it had to be suspended.

 9          And Investigator Hill requested that Dr. Orta send

10   to him personally his renewal certification.  As part of

11   that process he also went out and personally met with

12   Dr. Orta at his residence in Wisconsin, and they discussed

13   his ongoing relationship with YOD; what he had been doing,

14   what he planned to do in the future.

15          What he told them was exactly as it was outlined

16   in this case.  He told them that he provided consulting

17   services to YOD.  That the providers, or the patients that

18   would call in would provide their medical records.  He would

19   be contacted by telephone.  And you'll see some of the

20   e-mails where he's rejecting these people and he would say

21   yeah, this is legitimate medical thing or no, it's not, and

22   you can issue a prescription.

23          You'll hear from a expert by the name of Dr.

24   Bloom -- and he'll tell you at the time, in the time frame

25   of this indictment it was very unclear, if you haven't got

1    that already, about what the law was, at least in terms of

2    federal law -- and whether this new entrepreneur process of

3    delivering prescription medications and medical services

4    over the Internet was lawful.  It was very ambiguous.

5         As part of that Dr. Orta consulted in both the

6    confidential source and with the Diversion Investigator

7    Hill.  He told him that he was doing this over the Internet.

8    That he worked from his home.  That he saw no patients in

9    his home.  He had no patient contact whatsoever.  That he

10   merely consulted on the phone and talked to them and

11   reviewed their medical records.  He told them that if they

12   didn't have medical records, if they hadn't been previously

13   prescribed the drug, that they would not get it.  He said

14   that they were required to have a legitimate medical

15   condition, and that this was ongoing treatment.

16        He told them importantly, because you have heard

17   something about whether prescriptions are required, that he

18   only issued Schedule III, IV and V, which, as you heard,

19   only requires -- can even be an oral prescription, didn't

20   require a written prescription -- he did not do Schedule II

21   drugs.  Hydrocodone, if you recall the list, is Schedule

22   III.

23        He told them that, "I don't do Schedule II because

24   I believe it to be illegal.  As far as I understand it, with

25   this business model I can do Schedule III, IV and V, and we

 1    don't do Schedule II drugs."

 2            Now, what he didn't know, what you'll learn is

 3    that the CI was also talking to Kathy Giacobbe.  And she

 4    learned through conversations with her and Dr. Orta that the

 5    pharmacist -- pharmacies would not honor any Orta

 6    prescriptions because there wasn't a current and valid DEA

 7    certification, and she was going to fire him.  She was going

 8    to find another doctor that did have so that business could

 9    go on.

10            What Agent Hill did at that point was he went into

11    the system and took the hold off his license, and approved

12    it after knowing everything that Dr. Orta said that he was

13    doing, that the government is nowed saying is illegal, and

14    approved him.  And Dr. Orta relied on that, and believed

15    that the operation certainly was valid, otherwise they

16    wouldn't have given him a certificate to go on an issue

17    prescriptions for the next two years.  As we learned he

18    didn't know it was being photocopied.

19            But, importantly, at the end of the case when

20    we're done presenting our case, I believe you'll be

21    instructed that as a matter of law you must acquit him on a

22    doctrine called entrapment by estoppel.  Meaning that the

23    government can't approve you doing something and then later

24    come back --

25            MR. WASHINGTON:  Objection.  Argumentative.

1    THE COURT:  Sustained.

2    MR. TATE:  You'll hear the evidence at the end of

3  the case.  I believe when you listen to our case and you

4  hear the evidence and the Judge instructs you on the law

5  there's only one verdict you can come to as to Dr. Orta:

6  Not guilty.

7    THE COURT:  We'll take our lunchtime break.  And I

8  would ask you to be back in the jury deliberation room at

9  1:20 ready to come back into court at 1:30.

10    (Jury leaves courtroom at 12:16 p.m. and recess

11  taken.)

12    - - - - -

13  **UNITED STATES DISTRICT COURT**
   **WESTERN DISTRICT OF NORTH CAROLINA**

14

15    **CERTIFICATE OF REPORTER**

16    I, JOY KELLY, RPR, CRR, certify that the foregoing
   is a correct transcript from the record of proceedings in
17  the above-entitled matter.

18

19

20  <u>S/JOY KELLY</u>

21  **JOY KELLY, RPR, CRR**                    **Date** _____
   **U.S. Official Court Reporter**
22  **Charlotte, North Carolina**

23

24

25